[No. 27989.   Department One.   February 21, 1941.]

HARRY H. JOHNSTON, *Appellant,* v. JOHN SCHLARB *et al., Respondents.*[1]

[1]Reported in 110 P. (2d) 190.

*Chas. L. Westcott* and *Frank Hale,* for appellant.

*Thor C. Tollefson, G. E. Peterson, Charles T. Peterson,* and *Thomas L. Chambers,* for respondents.

ROBINSON, C. J.—This is an action for libel brought against the county commissioners of Pierce county, its auditor, its treasurer, its prosecuting attorney, one of his assistants, and the sureties on their official bonds. On appeal, there is but one assignment of error, to wit, "The lower court erred in sustaining the general demurrers."

The complaint to which the demurrers were sustained alleges that, in September, 1939, I. C. Gaspard commenced an action in mandamus against Pierce county, its commissioners, its auditor, and treasurer, on behalf of himself and of a great number of assignors, to collect certain sums of money with respect to services rendered as election officials during 1936, 1937, and 1938, over and above the sums they had already received for such services. Harry H. Johnston, the former prosecuting attorney for Pierce county, and John W. Fishburne, who had been a deputy in his office, were Gaspard's attorneys of record in the action. The defendant officers were represented by Thor C. Tollefson, the then prosecuting attorney, and G. E. Peterson, his assistant. They filed in that proceedings an answer setting up certain alleged affirmative defenses in which the following language, which is alleged to be libelous, was used:

"That some time prior to said election dates, the exact time of which being to the defendants unknown, the plaintiff I. C. Gaspard and Harry H. Johnston as prosecuting attorney of Pierce County, Washington, and John W. Fishburne as chief civil deputy prosecuting attorney, entered into a conspiracy one with the other, to defraud and cheat the defendant Pierce county out of the several sums of money that it would be entitled to be paid as reimbursement for the costs of the several elections hereinbefore referred to, which conspiracy to cheat and defraud Pierce County was contingent upon the outcome of the general election for the year 1938, wherein the said Harry H. Johnston was seeking re-election as prosecuting attorney. That as a result of his defeat for re-election as prosecuting attorney, and in furtherance of said conspiracy to cheat and defraud Pierce County, the plaintiff, I. C. Gaspard solicited the assignment of the claims of the claimants referred to in plaintiff's affidavit, which solicitation was in writing, copies of which are attached hereto and made a part hereof by reference and marked defendants Exhibit 'F' and 'G.'

"That as a result of said conspiracy to cheat and defraud Pierce County, numerous persons who claimed to have served on said election board, made an assignment to the plaintiff for such sums of money they claimed to be owing, copies of which assignments are attached hereto and made a part hereof by reference, and marked defendants' Exhibits 'H' and 'I.' That a large number of said assignors never served on the election board at the time set forth in said claim."

In order to determine the relationship of these allegations to the action, it is necessary to refer to some of the exhibits attached to the answer and by reference made a part thereof. They were before the court because the whole of the answer and its exhibits were attached to the complaint in this action. One of these exhibits purports to be the minutes of the Pierce county election board of January 28, 1936. Of this board, Johnston, the plaintiff in this action, was then

chairman, and the minutes purport to be certified by him as such. They read, in part, as follows:

"All members of the Board Present:—

"The only matter to come before the board was the fee for service of Inspectors and Judges, to be appointed by this board, thru certification by the Central Committee of respective parties, to serve on Election Board in the different precincts at the elections to be held on February 25th and March 10th respectively and mileage allowance to be granted Inspectors who may or will submit mileage costs, for the return of election supplies and records.

"On motion *and agreed to, by entire board* it was decided the fee for service of Inspectors and Judges, who are to serve on election Board at elections on February 25th and March 10th, is to be $5.00 and it must be with this understanding that they accept appointment. The Secretary of the Board is hereby instructed to so notify each appointee and such notification must read in part as follows:

" 'Your fee for this service will be $5.00 payable in Pierce County Warrant and it must be with this understanding that you accept the appointment.' " (Italics ours.)

This system, it appears from other exhibits, was followed in 1937 and 1938. The notice sent to the election officers by the secretary of the election board in 1938, pursuant to a resolution which, an exhibit shows, Johnston approved in writing, read, in part, as follows:

"You have been appointed to serve as.................................... of election in Precinct No.................. November 8, 1938.

"Your fee for this service will be $5.00 and it must be with this understanding that you accept the appointment."

During all three years, and, indeed, during all of the years subsequent to the passage of chapter 163, Laws of 1919, p. 470, the following statute (Rem. Rev. Stat., § 5166 [P. C. § 2156]) was in effect:

"The fees of officers of election shall be as follows:

"To the inspectors, judges and clerks of an election fifty cents per hour for full time employed by each of them. The person carrying the returns to the county auditor shall be entitled to ten cents per mile for each mile traveled."

Other exhibits attached to the alleged libelous answer, and made a part thereof by reference, would reasonably warrant an inference that, after Johnston, the plaintiff in this action, and his assistant prosecuting attorney John W. Fishburne, went out of office in January, 1939, they collaborated with Gaspard in promoting the action in which the alleged libelous answer was filed. Exhibit "F" reads as follows:

"PIERCE COUNTY DEMOCRATIC CENTRAL COMMITTEE
"Tacoma, Wash.

"Dear sir or Madam:

"This is to introduce Mr. I. C. Gaspard, Democratic Precinct Committeeman, Puyallup· Precinct No. 1, Ward No. 1. He is getting enough assignments from former members of the precinct election boards to justify the bring............ of an action against this county.

"This action is for the purpose of proving that the county has not been paying those persons serving on the boards as much as the law allows. A favorable decision in this case will benefit all persons on the election boards in the future.

"There is not enough money involved in any one precinct to make this case worth while, but assignments from a number of precincts will involve a large enough sum to pay for the work which is necessary in obtaining signatures and trying the law case.

"I feel sure that each of you will recognize the need for working collectively and will assign your interests to Mr. Gaspard.              Sincerely yours,

"JOHN W. FISHBURNE,
"County Chairman."

It would appear, or rather it is inferentially alleged, that Mr. Gaspard, with legal assistance, got out a cir-

cular to past election officials. The circular which appears as an exhibit to the alleged libelous answer we reproduce, in part, as follows:

"OF INTEREST TO ALL PERSONS WHO SERVED ON PRECINCT ELECTION BOARDS DURING THE PAST THREE YEARS

"GENERAL ELECTION LAWS, State of Washington:

[Here follows Rem. Rev. Stat., § 5166, providing for fifty cents per hour and ten cents mileage, and certain other election regulations.]

"The following has been brought to our attention:

"The *legal fee* has *not* been paid to members of election boards;

"Inspectors calling for books have not been paid extra allowance.

"Persons taking in the returns have not received the 10¢ per mile.

"The pay is not the same for all election boards for the same election. (Some country precinct members received $7.00.)

"Persons not on election boards received 50¢ per hour straight time.

"Extra clerks in balloting precincts came to work at 8 p. m. and received 50¢ per hour from 7:30 on, full time.

"Cost of machines per election, int. on investment, depreciation, etc. $50.00.

"County auditor asks for new building for storage to save cost of storage.

"Election boards in other counties in this state receive legal rate.

"Precinct election boards working from 7:30 a. m. to 8:30 p. m. received $5.00. Rate of pay 35½¢ per hour or $68.00 pr. month. Who in the court house works for that amount?

"With deputy sheriffs at the rate of $175.00 per month and others in proportion. WPA basic wage 58¢ per hour.

We maintain that no COUNTY OFFICER has the right to disregard the law and set-up conditions contrary to law, or to hire and fire.

"Objections have been raised individually and collectively without results. We are asking you to sign

the enclosed assignment to provide funds without cost to you, to have this condition rectified and to take it into court, if necessary. Individually the amount is not large but collectively it will amount to enough to pay for court costs and taking assignments.

"Many have signed and we would like to have you join with us for the benefit of all election boards in Pierce County.

"Sign the enclosed assignment, be sure to fill out your time for each election as well as the date and address, precinct number or name.

"MAIL AT ONCE     TODAY     DO NOT DELAY
To I. C. GASPARD
320 2nd St. N. E.
Puyallup, Washington"

The enclosed instrument contained blanks to be filled out regarding services rendered as inspector, judge, or clerk of all elections held in 1936, 1937, 1938, and during March of 1939, and closed with the following:

"ASSIGNMENT

"We, the undersigned, do hereby assign to I. C. Gaspard for collection, whatever sum or sums may be rightfully due to us for services rendered Pierce County either as inspector or judge of election in all elections in which we took part during the past three years, for which we have not been paid in full according to the provisions of the laws of the State of Washington. It is understood that in consideration of this assignment we are to receive 25% of whatever may be collected; 25% is to be paid to the assignee for the expense of obtaining the assignments and the remaining 50% is to be paid to the attorneys of the assignee for their services out of which all costs, expenses and charges of the litigation shall be paid."

The defendants, in pressing their general demurrers, took the position that the matter alleged to be libelous was privileged, first, because contained in a pleading in an action, and, second, because of their immunity as public officers. They also contended that, in any

event, the action would not lie because a final determination had not been made of the proceedings in which the alleged libelous publication was made. The trial judge sustained the demurrers upon the ground that, since the alleged libelous matter was contained in a pleading, it was absolutely privileged.

Although the question was well briefed by both sides, we have gone far beyond the briefs in an attempt to find the true rule governing the matter under consideration. In so doing, we have been astonished at the multitude of cases dealing with the subject. These may, of course, be found by reference to the American Digest system and the standard legal encyclopedias. Hundreds are collected in the footnotes to the articles by Van Vechten Veeder on Absolute Immunity in Defamation, 9 Columbia Law Review 463, 490, from which the second circuit court of appeals quotes so liberally and approvingly in *Sacks v. Stecker,* 60 F. (2d) 73, 75. Certain cases, however, stand out as landmarks in the wilderness of authority.

The leading early American cases are: *Hastings v. Lusk,* 22 Wend. (N. Y.) 410, 34 Am. Dec. 330, and *Hoar v. Wood,* 44 Mass. (Met.) 193. In the last of these, decided just a hundred years ago, Chief Justice Shaw of the supreme judicial court of Massachusetts, in speaking of the privilege, said:

"We can perceive no substantial difference between the case of counsel and that of a party. The privilege is extended to the counsel, for the interest and benefit of the party, and to allow him full scope and freedom, in the support or defense of the rights of the party."

And of the rule itself, he said:

"Then we take the rule to be well settled by the authorities, that words spoken in the course of judicial proceedings, though they are such as impute crime to another, and therefore if spoken elsewhere, would import malice and be actionable in themselves, are not

actionable, if they are applicable and pertinent to the subject of inquiry. The question, therefore, in such cases is not whether the words spoken are true, not whether they are actionable in themselves, but whether they were spoken in the course of judicial proceedings, and whether they were relevant and pertinent to the cause or subject of inquiry. And in determining what is pertinent, much latitude must be allowed to the judgment and discretion of those who are intrusted with the conduct of a cause in court, and a much larger allowance made for the ardent and excited feelings, with which a party, or counsel who naturally and almost necessarily identifies himself with his client, may become animated, by constantly regarding one side only of an interesting and animated controversy, in which the dearest rights of such party may become involved. . . .

"Still, this privilege must be restrained by some limit; and we consider that limit to be this; that a party or counsel shall not avail himself of his situation, to gratify private malice by uttering slanderous expressions either against a party, witness or third person, which have no relation to the cause or subject matter of the inquiry. Subject to this restriction, it is, on the whole, for the public interest, and best calculated to subserve the purposes of justice, to allow counsel full freedom of speech, in conducting the causes, and advocating and sustaining the rights, of their constituents; and this freedom of discussion ought not to be impaired by numerous and refined distinctions."

The next leading American case is *Maulsby v. Reifsnider*, 69 Md. 143, 14 Atl. 505, decided in 1888. Five years prior to that time, it had been squarely held in England, in the celebrated case of *Munster v. Lamb*, 52 L. J. Q. B. 726, 11 Q. B. D. 588, 7 Eng. R. C. 714, that an attorney was absolutely privileged as to words spoken or written during the conduct of an action and while acting as an advocate, however false and malicious the words might be. Recognizing that the privi-

lege of a party to an action is the same as that of his attorney, the court, in *Maulsby v. Reifsnider,* reviewed both the English and American cases on the subject at great length, and refused to accept the doctrine of unqualified privilege laid down by Brett, M. R., in *Munster v. Lamb:*

"We cannot agree with Brett, M. R., that in a suit against counsel for slander *the only inquiry is whether the words were spoken in a judicial proceeding, and if so, the case must be stopped.* We quite agree however with Bramwell, J. A., in *Seaman v. Netherclift,* that *'relevant'* and *'pertinent'* are not the best words that could be used. These words have in a measure a technical meaning, and we all know the difficulty in determining in some cases what is relevant or pertinent. With Lord Chancellor Cairns we prefer the words *'having reference,'* or *'made with reference,'* or in the language of Shaw, C. J. [In *Hoar v. Wood, supra*], *'having relation to the cause or subject-matter.'* And if counsel in the trial of a cause maliciously slanders a party, or witness or any other person in regard to a matter that has no *reference* or *relation* to, or connection with, the case before the Court, he is and ought to be answerable in an action by the party injured."

In speaking of the actual words used in that case, the court went on to say:

"If they had reference or relation to the case on trial, then they are strictly within the rule of privilege and whether they were true or false, or whether they were spoken maliciously or in good faith, are questions altogether immaterial,—being privileged no action will lie against the defendant."

One member of the court dissented, but only upon the ground that he thought the English rule should be adopted in its entirety.

"I place my assent to the affirmance of the judgment of the learned Court below, entirely upon the ground, that the words spoken by the appellee were,

having been spoken in a Court of justice during a judicial investigation in which he was engaged as counsel, absolutely privileged, without any reference whatever to their relevancy."

The great majority of the American decisions rendered since the decision in the *Reifsnider* case have followed the suggestion therein made, and avoided using the word "relevant" in stating the rule lest its use should give the mistaken impression that the privilege extends only to matters which are *legally* relevant.

In determining whether or not matter spoken in the conduct of an action or contained in the pleadings is privileged, the test is not—Is it legally relevant? but—Does it have reference and relation to the subject matter of the action? We quote from *Sacks v. Stecker*, 60 F. (2d) 73, 75, decided by the Federal second circuit court of appeals in 1932:

"By an almost unbroken line of authority in this country and England, a party who files a pleading or affidavit in a judicial proceeding has absolute immunity, though his statements are defamatory and malicious, if they relate to the subject of inquiry. In the recent case of *Andrews v. Gardiner*, 224 N. Y. at page 446, 121 N. E. 341, 343, 2 A. L. R. 1371, Cardozo, J., quoted with approval the words of Lord Mansfield in *Regina v. Skinner*, Lofft, 55, that: 'Neither party, witness, counsel, jury, or judge, can be put to answer, civilly or criminally, for words spoken in office.' This, so far as civil remedies go, is still the law in England, and, if the words spoken relate to the subject of inquiry, is the practically universal rule in this country."

It seems unnecessary to cite further decisions, in view of the fact that the American Law Institute, in its restatement of the Law of Torts published in 1938, has, in its chapter on Defamation, stated the rule as it relates to parties as follows:

"§ 587. A party to a private litigation or a private prosecutor or defendant in a criminal prosecution is

absolutely privileged to publish false and defamatory matter of another in communications preliminary to a proposed judicial proceeding, or in the institution of or during the course and as a part of a judicial proceeding in which he participates, if the matter has *some relation* thereto." (Italics ours.)

Comment (c) under this section, Restatement, Vol. 3, p. 232, is as follows:

"c. Relation of statement to proceedings. *It is not necessary that the defamatory matter be relevant or material to any issue before the court. It is enough that it have some reference to the subject of the inquiry.* Thus, while a party may not introduce into his pleadings defamatory matter which is entirely disconnected with the litigation, he is not answerable for defamatory matter volunteered or included by way of surplusage in his pleadings *if it has any bearing upon the subject matter of the litigation.*" (Italics ours.)

Section 586 states the rule relating to the privilege of attorneys, and, since the privilege of the attorney is the same as that of the litigant whom he represents, the rule and the comments thereunder are to the same effect as those above quoted.

It is also held that, in the application of the rule, doubts should be resolved in favor of the speaker or pleader. *Kemper v. Fort,* 219 Pa. 85, 67 Atl. 991, 123 Am. St. 623, 13 L. R. A. (N. S.) 820; *Bussewitz v. Wisconsin Teachers' Ass'n,* 188 Wis. 121, 205 N. W. 808, 42 A. L. R. 873. We quote from the opinion in *Andrews v. Gardiner,* 224 N. Y. 440, 121 N. E. 341, 2 A. L. R. 1371, in which the late Mr. Justice Cardozo, then a member of that court, in speaking for the court, said:

"There is no room in such matters for any strict or narrow test. Much must be left to the discretion of the advocate. The privilege embraces anything that may possibly be pertinent."

In the instant case, the appellant puts some dependence upon the fact that, before the demurrers were heard in this case, the matters complained of as libelous in the mandamus action were stricken from the answer as irrelevant and immaterial by one of the judges of the superior court of Pierce county. This, as we have seen, is not determinative. We are not here concerned with whether or not the allegations complained of were legally relevant. They are absolutely privileged, according to the rule laid down in the Restatement, which we think is fully supported by the decided cases, if they have *"some relation"* to the judicial proceedings in which they were used and have *"any bearing upon the subject matter of the litigation."*

In determining the question as to whether the allegations complained of were related to the subject matter of the action, we must, of course, examine the whole proceedings, and particularly the answer in which they appear, including the exhibits attached thereto and made a part thereof. This was an action to set aside a great number of contracts. It will be remembered that the election officers, according to the exhibits, which are themselves allegations, agreed to serve for five dollars per day. That was a condition of their employment. Those contracts had been fully executed. The action, therefore, being for the purpose of setting aside contracts voluntarily entered into and executed according to their tenor, was equitable in its nature. It is alleged, per one of the exhibits, that the plaintiff was chairman of the election board and actively participated in the making of these contracts relating to the elections in the spring of 1936. According to the allegations, per exhibit, he again participated as a member of the election board in arranging five dollar contracts for the spring election of 1938,

and also for the fall elections of that year. He went out of office at the end of 1938.

It is alleged, through another exhibit, that, shortly after he had gone out of office, his former chief civil deputy, John W. Fishburne, actively participated in the promotion of the mandamus action, using the stationery of the Pierce County Democratic Committee, of which he was chairman, to favorably introduce Mr. Gaspard to persons who had served on the election boards, to the end that he might successfully solicit their claims for the purpose of making up a case "worth while" prosecuting against the county and its officers. The solicitation was effective. A great number of election officials assigned claims to Gaspard, upon the agreement and understanding that they were to receive twenty-five per cent of the amounts recovered; Gaspard, twenty-five per cent for the expense of obtaining the assignments; and the remaining fifty per cent, less costs, to go to the attorneys who would prosecute the action. When the action was filed, it appeared that those attorneys were Harry H. Johnston, the plaintiff, and his former deputy, John W. Fishburne. It seems to us that these matters clearly have "some relation" to that proceedings and have "a bearing upon the subject matter of the litigation."

The defendants were entitled to believe that Mr. Johnston, being a lawyer, the legal adviser of the county and its officers, and a member of the election board, knew of the provisions of Rem. Rev. Stat., § 5166, requiring the payment of fifty cents per hour to election officials, and its requirement concerning mileage, when he voted in favor of securing the contracts of persons desiring to serve as election officials to serve for a lesser sum. The allegation that, in so doing, he acted in pursuance of an unlawful conspiracy with his deputy Fishburne and with Gaspard to thus lay a

foundation for some profitable litigation after he should retire from office, is somewhat fantastic; but litigants have the right to plead the fantastic, and, we may add parenthetically, they frequently do.

It is urged that the allegations concerning the plaintiff cannot possibly be regarded as relating to the case because he was not even a party thereto. Nominally, this is so, but it is alleged, per exhibits attached to the answer, that he and his associate had a fifty per cent interest (less costs) in the recovery sought, and that the whole case had been worked up by soliciting the assignors through Gaspard.

It was also categorically alleged:

"That a large number of said assignors never served on the election board at the time set forth in said claim; that none of the assignors served on the election board the number of hours set forth after their respective names, and by reason thereof said claim is false and fraudulent, and was made for the sole purpose of carrying out the conspiracy to cheat and defraud Pierce county; that by reason of the matters and things herein set forth, said assignments are against public policy and are void."

Even if the allegations of fact complained of, as distinguished from the conclusions attached thereto, had not been pleaded, it is our opinion that they were so intimately related to the subject of the litigation that they would have inevitably become a subject of inquiry upon the trial of the case. A court which is called upon to exercise its equitable power in setting aside contracts, particularly contracts which have been fully executed according to their tenor, must necessarily inquire into the circumstances under which they were made and into the general background of the action.

Our own cases, though continuing to use the words "relevant" and "pertinent" in stating the rule, are substantially in accord with the rule which we have above

approved.   See *Abbott v. National Bank of Commerce*, 20 Wash. 552, 56 Pac. 376; *Viss v. Calligan*, 91 Wash. 673, 158 Pac. 1012, Ann. Cas. 1918A, 819, and particularly the opinion per Ellis, J., in *Miller v. Gust*, 71 Wash. 139, 127 Pac. 845, where it is said:

"   .   .   .   that the privilege is grounded in a wholesome public policy which regards the public good, resulting from a free and untrammeled inquiry in courts of justice, as paramount to the redress of occasional private wrongs which may result from an abuse of the privilege."

It is our opinion that the matters alleged to be libelous, even if they were false and defamatory and even if not legally relevant to the proceedings in which they were pleaded, had "some relation" thereto and some "bearing upon the subject matter of the litigation," and that, therefore, the trial court committed no error in holding that they were, in law, absolutely privileged.

The judgment of dismissal entered by the lower court upon the plaintiff's refusal to amend or plead further is accordingly affirmed.

BEALS, BLAKE, MILLARD, and SIMPSON, JJ., concur.