[Civ. No. 28769. Second Dist., Div. Three. Sept. 21, 1966.]

CHARLES B. THORNTON, Plaintiff and Appellant, v. HAROLD RHODEN, Defendant and Respondent.

[Civ. No. 29102. Second Dist., Div. Three. Sept. 21, 1966.]

CHARLES B. THORNTON, Plaintiff and Appellant, v. NOAH DIETRICH et al., Defendants and Respondents.

(Consolidated Cases)

Sheppard, Mullin, Richter & Hampton, Frank Simpson III, Walter L. Williams, Jr., Ball, Hunt & Hart, Joseph A. Ball, Joseph D. Mullender, Jr., and William A. Masterson, for Plaintiff and Appellant.

Harold Rhoden, in pro. per., for Defendants and Respondents.

KAUS, J.—These two consolidated appeals represent the appellate phase of a minor skirmish in a major battle which has once before reached the official reports in *Steele* v. *Superior Court*, 56 Cal.2d 402 [15 Cal.Rptr. 116, 364 P.2d 292].

The parent litigation is a case entitled Steele v. Litton Industries, Inc., et al., which for several years has been and still is pending in the Superior Court of Los Angeles County. In that case Steele is suing Litton Industries, Inc., ("Litton"), Thornton and others for vast sums of money and stock which he claims to have coming to him by virtue of his participation in the founding of Litton and certain agreements made then and thereafter. While that action was awaiting trial, Steele, through his attorney Harold Rhoden, noticed and took the deposition of one Dietrich. At that deposition Dietrich, mostly in response to questions asked of him by Rhoden, but partly in reply to queries from Litton's attorney, said several unflattering things about Thornton.[1] Two days after the deposition was on file, Thornton filed a defamation action against Dietrich, Steele and Rhoden. About a month later a first amended complaint was filed. Although initially a demurrer to that complaint was overruled by Judge Patton, Judge McCoy ruled in connection with later discovery proceedings in the defamation action that the alleged wrongs were absolutely privileged and that any orders permitting Thornton further discovery would be in excess of the court's jurisdiction. After several motions by Thornton to be given leave to amend were denied, Judge Mahl eventually granted a motion by all three defendants to dismiss the first amended complaint. A judgment of dismissal was filed as to the defendant Rhoden, but not as to Steele and Dietrich who had counterclaims pending against Thornton;[2] these arose out of what Thornton is said to

---

[1] We will discuss the statements made about Thornton only to the extent that such discussion is absolutely necessary to our opinion. The entire record before us is replete with threats by everybody against everybody else to sue them on any theory which imaginative counsel can think of. There is no desire on the part of this court to act as an agent—albeit immune—who further publicizes a libel or slander and thereby adds grist to the parties' mills.

[2] In his original counterclaim, Dietrich said that Thornton's statements about him caused him a certain amount of concern and anxiety, but that, considering the source, his damages were only forty cents. Later on, in a counterclaim filed with the answer to Thornton's amended complaint,

have said about Dietrich's quality as a deponent and about Steele's as a litigant. Rhoden is therefore the only respondent to Thornton's appeal from the judgment in the defamation action.

During Thornton's unsuccessful attempts to amend the complaint in the defamation action, he tried to add counts for abuse of process. Although he was unsuccessful in this, he filed an independent action against Rhoden, Steele and Dietrich on that theory. Eventually a summary judgment was entered in favor of the defendants. All three are respondents to the appeal from that judgment.

In support of a reversal of the judgment in the defamation action Thornton urges that the first amended complaint did state a cause of action. No argument is made that the superior court abused its discretion in not permitting the proposed amendments thereto to be filed. In the abuse of process action, it is submitted that the papers before the superior court on the motion for summary judgment did disclose several triable issues.

### The Defamation Action.

Herewith a summary of Thornton's allegations in the defamation action, omitting the customary allegations concerning Thornton's standing in the community, loss of reputation and damages:

The pendency of Steele v. Litton, et al., is pleaded, as is Rhoden's representation of Steele in that action. A brief summary of the charging allegations therein is given, with a statement that Thornton had denied them. It is then alleged that Dietrich and Rhoden orally published certain defamatory matter about Thornton at the deposition.[3] These matters were false and had no "relation or reference to the cause in the Steele case or to any subject matter involved therein." Defendants knew that these statements were false and published them with actual malice. Certain facts are then pleaded from which the reader is invited to infer the existence of such a state of mind. One fact is Rhoden's insistence in proceeding

Dietrich alleged that in the meanwhile he had discovered that his damages were more than nominal and actually amounted to $50,000. The amount of punitive damages remained the same—$1,000,000.

[3]The relevant portions of the deposition are quoted *in haec verba* by way of exhibit. For present purposes we assume that the matters said about Thornton were defamatory within the meaning of section 46, subdivisions 1 and 3 of the Civil Code and that they were so "without the necessity of explanatory matter." (Civ. Code, § 45a.) No special damages are pleaded.

with the deposition in spite of objections by Litton's counsel.[4] There is a letter from Rhoden to Thornton's lawyers threatening litigation because Thornton had issued a public statement said to be to the effect that Dietrich had committed perjury at the deposition. This letter was written two days after the deposition had been filed on December 19, 1962. A third is a sarcastic letter from Rhoden, threatening an action for malicious prosecution. This letter also contained certain snippish remarks about Rhoden's ability to pay the forty million dollars demanded by Thornton in the original complaint in the defamation action and an offer to stipulate to increase the prayer to four hundred million dollars. Fourth, a letter from Rhoden to counsel for Thornton, describing the defamation action as the illegitimate sister of the Steele case, intimating that a certain prominent law firm to which he had sent an information copy of his previous letter could not be expected to have any connection with a lawsuit such as Thornton's and an ironic inquiry as to why he, Dietrich and Steele had not yet been sued for libel contained in the answer to the original complaint. Fifth, the reallegation and republication by defendants of the false and defamatory matter said during the deposition in that answer. Sixth, the fact that when the deposition was filed on December 19, 1962, Rhoden instructed his process server to notify the press at the courthouse that a deposition involving the particular defamatory matter had just been filed, that the process server obeyed instructions and that when one of the reporters telephoned Rhoden about the deposition he gave her the numbers of the pages which contained the defamatory matter.

It is then further alleged that by causing the deposition to be transcribed, defendants published the previous slander as a libel and that all defendants "conspired" to cause harm and damage to Thornton by publishing the defamatory matters orally and in writing.

It is to be noted from the above that the only charged publication of the defamatory matter as a slander was the publication at the deposition and the only charged publication as a libel was the transcription thereof.[5] The notification to the

---

[4]These objections are set forth in detail. All they show is a request by counsel to be advised what the questions and answers had to do with the lawsuit. At most they can be construed as giving Rhoden fair warning that a contention might be made in the future that the scope of privileged inquiry had been exceeded.

[5]"Subsequent to November 29, 1962, and on or before December 18, 1962, defendants, and each of them, caused the defamatory matter re-

newspapers by Rhoden's process server and his helpfulness to the reporter who called him are only alleged as evidence showing the existence of malice.[6]

As correctly held by the trial court, plaintiff's attempt to state a cause of action for defamation comes to naught because of the privilege recognized in connection with judicial proceedings. (Civ. Code., § 47, subd. 2.)

Before discussing the applicable law, it seems proper to state Rhoden's contention concerning the reasons why the questions and answers asked and given at the deposition had some relationship to Steele v. Litton, et al. It is claimed that at the trial for which he was then preparing, the question of credibility of Thornton as a witness would be involved. It would then be proper for Steele to attempt to impeach him by showing "that his general reputation for truth, honesty or integrity is bad . . . ." (Code Civ. Proc., § 2051.) Rhoden recognized that he would not be permitted to show "particular wrongful acts" in connection with such attempted impeachment; however he anticipated that Thornton might counter the impeachment by evidence of his good character, as he clearly would have been entitled to do. (Code Civ. Proc., § 2053.) On cross-examination of witnesses to Thornton's good character whose direct testimony according to permitted practice would take the form of evidence concerning his good reputation for truth, honesty and integrity, it would then be permissible to ask such character witnesses whether they "had heard" of the derogatory matters brought out by Dietrich in his deposition. (*People* v. *Thomas,* 58 Cal.2d 121, 132 [23 Cal.Rptr. 161, 373 P.2d 97]; *People* v. *Malloy,* 199 Cal.App.2d 219, 226-227 [18 Cal.Rptr. 545].) Rhoden contends that upon the asking of the "have you heard" type of question, his good faith would

---

ferred to in paragraph 7 hereof to be transcribed; by so doing, defendants and each of them published said defamatory matter in writing."

[6]The significance of similar allegations in the abuse of process action will be discussed in connection with that appeal. For present purposes we mention the fact that it is not alleged that Rhoden's activities in connection with the filing of the deposition were a republication only to note that we are therefore not faced with the problem of a possibly unprivileged republication of a defamation which, when first made, was absolutely or qualifiedly privileged. It is quite clear that no such issue of law was ever tendered to the trial court at any time before the dismissal of the defamation action. Two attempts to file further amended complaints were made. Neither in the proposed second amended complaint nor in the proposed third amended complaint was there a charge that anything but the utterance of the slander at the deposition or the transcription of the deposition before its filing constituted the publications complained of. We assume, without deciding, that the transcription of the reporter's notes was an adequate publication.

be challenged[7] and that he took the deposition in order to be able to meet such a challenge successfully. Objection that to prove good faith it was not necessary to cause the defamatory matter to be uttered at a deposition, but that a signed statement or affidavit from Dietrich would have been sufficient, is met by the assertion that the procedure chosen was one more calculated to demonstrate good faith in that Thornton's attorneys were given an opportunity to cross-examine Dietrich and, further, any possible claim of forgery of a statement or affidavit or unfairness in connection with its procurement was precluded.

It is thus apparent that no contention is made that—except for a radical change in the rules of evidence—Dietrich's answers were admissible as such, either directly or for the purpose of impeaching any witness or that they were calculated to lead to the discovery of admissible evidence.[8]

Both parties recognize that the privilege of an attorney in judicial proceedings is "absolute" in the sense that it cannot be defeated by an allegation or showing that the publication of the defamation was made with malice.[9] Although the authorities cited in the briefs range far afield, the controversy can be narrowed considerably. It really comes down to this: in order to claim the absolute privilege, is it necessary that a

---

[7]The way counsel in this action and in the parent litigation have been at each other's throats in the trial court makes Rhoden's fears not only theoretically reasonable, but factually compelling. (Messrs. Ball, Hunt & Hart did not appear in these actions until the appeal. Mr. William A. Masterson became cocounsel for Thornton after submission by this court.)

[8]Although Rhoden—apparently out of respect for the quality of his opposition—does not advance this argument, there did at all times exist the possibility that in an attempt to rehabilitate himself from the impeachment, Thornton or his witnesses might go too far in professions of Thornton's rectitude and thereby bring into play the rule of *People* v. *Westek*, 31 Cal.2d 469 [190 P.2d 9]: "But here a totally different situation is involved where appellant, apparently actuated by a desire to place himself in an especially favorable light before the jury, injected into the case in the course of his direct examination the whole subject matter of his past conduct . . . and it was to offset the effect of this gratuitous testimony that the prosecution introduced the challenged evidence." (*Ibid.*, p. 476.) (See also *Travis* v. *Southern Pac. Co.*, 210 Cal. App.2d 410, 421 [26 Cal.Rptr. 700]; Witkin, Cal. Evidence, § 679.) Indeed, our Supreme Court seems to have assumed as a matter of course that information to counteract such testimony is discoverable and "relevant," at least during the discovery phase of the litigation. (*Chronicle Publishing Co.* v. *Superior Court*, 54 Cal.2d 548, 560 [7 Cal.Rptr. 109, 354 P.2d 637].)

[9]This concession by plaintiff makes it unnecessary for us to determine on the appeal from the defamation action, whether the facts pleaded do show that Rhoden acted maliciously.

defamation published in a judicial proceeding have something "to do with" the proceeding and, if so, what is the appropriate word or phrase with which that necessary relationship should be described? Is it "relevancy," "materiality," "pertinency," or "some relation" to the proceeding—the last phrase being the one used by the Restatement of Torts. (Rest., Torts, §§ 585-588.)

The history of section 47, subdivision 2 of the Civil Code appears to point toward a very broad concept of "relevancy" —a word which at this point we do not use as a legal term of art. When first enacted in 1872, it extended the privilege only as follows: "In testifying as a witness in any proceeding authorized by law to a matter pertinent and material, or in reply to a question allowed by the tribunal." On its face the privilege thus protected only a witness and the code appeared to draw a distinction between matter volunteered by the witness and answers responsive to questions which survived express or implied judicial scrutiny. The subdivision was amended in 1873-74. It now applied "In any legislative or judicial proceeding, or in any other official proceeding authorized by law." The privilege was thus broadened by being made applicable to persons other than witnesses and all references to materiality and pertinency were removed from this section. Thus it stood until 1927.[10]

It was, nevertheless, during that period that the Supreme Court decided the case of *Carpenter* v. *Ashley*, 148 Cal. 422 [83 P. 444, 7 Ann.Cas. 601]. Ashley, a district attorney, during the course of a criminal trial in which Carpenter was conducting the defense, had said in reply to an accusation by Carpenter that he had gone beyond the legitimate boundary of "bulldozing" a witness, that Carpenter had committed perjury and subornation of perjury. Without as much as a nod to the implications of the 1873-74 change to section 47, subdivision 2, the Supreme Court held that the trial court

---

[10]In 1901 the Legislature enacted what purported to be an extensive revision of the Civil Code. (Stats. 1901, ch. 157.) This revision added the following language to section 47, subdivision 2: "But irrelevant or immaterial matter voluntarily and maliciously published in the course of a judicial proceeding is not privileged." At the same session of the Legislature it also enacted revisions of the Code of Civil Procedure. (Stats. 1901, ch. 102.) The revision of the Code of Civil Procedure was, in *Lewis* v. *Dunne*, 134 Cal. 291 [66 P. 478, 86 Am.St.Rep. 257, 55 L.R.A. 833], decided the same year, held to violate article IV, section 24 of the state Constitution. Since the revision of the Civil Code suffered from the same defect, it remained a dead letter and was repealed as "obsolete and superseded" by the 1955 Legislature. (Stats. 1955, ch. 28.)

erred in various ways, including an instruction to the jury to the effect that if the words were spoken "in the course of a judicial proceeding" no action would lie. The accusation of perjury and subornation of perjury, said the Court, "had no pertinency, relevancy, or reference to the charge of larceny in the pending action . . . ." (*Ibid.*, p. 426.) Normally we would therefore have to accept as authoritative interpretation of the state of our law before 1927, that the privilege cannot be claimed simply because a time, place and subject matter "relationship" to the judicial proceeding is established, for whatever may be said about the legal relevancy or propriety of Ashley's remarks, they did "relate" to the matter before the tribunal. Yet the very court which decided *Carpenter* v. *Ashley* in 1906 still felt that the question was an open one in 1911. *Gosewisch* v. *Doran*, 161 Cal. 511 [119 P. 656, Ann.Cas. 1913D 442] involved libelous matter allegedly contained in a complaint in an earlier civil action filed by the defendants. Although it is clear that the defamatory matter in the complaint was not only relevant to it, but was the very charge of embezzlement and misappropriation for which that complaint had been filed, the Supreme Court did discuss the extent of "absoluteness" of the privilege. It noted that *Wyatt* v. *Buell*, 47 Cal. 624, a decision handed down in 1874 but involving facts which happened in 1870 applied a "relevancy" limitation to the privilege and it observed that in *Hollis* v. *Meux*, 69 Cal. 625, 629-630 [11 P. 248, 58 Am.St.Rep. 574], the court had noted the possibility that the 1873-74 amendment to section 47, subdivision 2, was intended to change the rule of *Wyatt* v. *Buell*. Recalling that in *Ball* v. *Rawles*, 93 Cal. 222, 236 [28 P. 937, 27 Am.St.Rep. 174], the court had denominated the privilege as an absolute one, it then refused to decide the question, holding only that malice did not defeat it. As far as *Grosewisch* is concerned, *Carpenter* v. *Ashley,* might never have been written.

*Irwin* v. *Newby,* 102 Cal.App. 110 [282 P. 810, 283 P. 370] was decided in 1929. The plaintiff contended that the privilege "will not be allowed to serve as a cloak to conceal a palpable libel where not necessary to preserve the legitimate freedom of action of the parties in a judicial proceeding." To support his point he presented an argument that certain matters said in a cross-complaint were, as a matter of law, irrelevant to the issues of the case. The court said that this was not enough to defeat the privilege. Lack of legal relevancy is not identical with "no reasonable pertinency . . . to the matter involved

. . . ." Once more the existence of some limitation to the privilege is recognized, but the facts do not bring the limitation into play.

In 1927 the Legislature added a proviso to subdivision 2 which provided, in brief, that certain allegations made in divorce and similar actions against corespondents are not privileged unless stated under oath, without malice, on reasonable grounds and "unless such allegation . . . be material and relevant to the issues in such action." In *Moore* v. *United States Fidelity & Guar. Co.*, 122 Cal.App. 205 [9 P.2d 562], the court held that the limitation of the proviso strengthened the balance of the subdivision and that the Legislature intended to "bound the limitation" of earlier cases such as *Wyatt* v. *Buell, supra,* which had confined the applicability of the privilege to statements "material and pertinent." As a precedent, *Moore* v. *United States Fidelity & Guar. Co.,* is somewhat weakened by two considerations: 1. the discussion of the privilege point is quite unnecessary to the decision, the court having previously determined that the action was barred by the statute of limitations; and 2. the court adds the by now customary statement that whatever may be the limitation of the privilege, the defamatory matter involved was material and pertinent.

*Donnell* v. *Linforth,* 11 Cal.App.2d 25 [52 P.2d 937], a very strong case in defendant's favor, is harder to distinguish. There the plaintiff had testified against defendants in a personal injury action. In support of a motion for a new trial defendants had filed affidavits to the effect that plaintiff had stolen hogs from one of the affiants. Without in any way discussing the relationship between that charge and the issues in the personal injury action, the court said the privilege was "absolute." Finally in *Albertson* v. *Raboff,* 46 Cal.2d 375, 379 [295 P.2d 405] the Supreme Court referred to the privilege as "absolute," but the facts of the case are sufficiently different from the one at bar to persuade us that the problem we are discussing was not in the mind of the court.

The way in which these somewhat conflicting authorities were eventually reconciled was foreshadowed in *Irwin* v. *Newby, supra.* The court said—using the language of *Carpenter* v. *Ashley*—"that if the defamatory words 'have no relation or reference to the cause in hand or to any subject matter involved therein' then such defamatory words are not *in fact* published *in a judicial proceeding* even though such defamatory words are published during the progress of a trial

and in the very courtroom where the cause is on trial.'' (*Ibid.* p. 116.) This approach, which ignores legal niceties and merely looks to some logical connection between the utterance and the proceeding, solves most problems. On the one hand it does not protect attorneys, witnesses and litigants who use the mere fact that they are talking in the course of a judicial proceedings as a pretext to defame persons with respect to matters which have nothing whatever to do with the question under consideration,[11] yet it does shield counsel, his client and witnesses from having their motives questioned and being subjected to litigation if some connection between the utterance and the judicial inquiry can be established.

A rule which requires the demonstration of some connection with the proceedings, yet dispenses with the requirement of relevancy, materiality or pertinency, in their technical sense appears to us not only to be a fair compromise between the competing considerations involved, but to be the one adopted by the Restatement of Torts and by at least two decisions in this state, *Jordan* v. *Lemaire,* 222 Cal.App.2d 622, 624-625 [35 Cal.Rptr. 337] and *Lewis* v. *Linn,* 209 Cal.App.2d 394 [26 Cal.Rptr. 6].[12] The test, as formulated by the Restatement appears to be purposely couched in nontechnical legal language: does the utterance have ''some relation'' to the judicial proceeding? This is the language used by the authors of the Restatement with respect to the privilege of judicial officers (§ 585), attorneys (§ 586), parties (§ 587), witnesses (§ 588) and jurors (§ 589.) It seems to us a very workable test, though like any other not without its problems in fringe areas.

Applied to the facts of the case before us we have no doubt that the publications in question come within the privilege. In fact there is a very close precedent for it in an old New York case, *Youmans* v. *Smith,* 153 N.Y. 214 [47 N.E. 265]. In

---

[11]The Restatement of Torts puts it this way: ''On the other hand, the privilege does not cover the attorney's publication of defamatory matter which has no connection whatever with the litigation.'' (§ 586, com. c.)

[12]The rule of the Restatement, which was adopted—even if only by dictum—in *Lewis* v. *Linn* appears to be in accord with the English rule announced in *Munster* v. *Lamb,* 11 Q.B.D. 588. Although that case defines the privilege in the broadest possible terms, appearing to extend it to any statement whatsoever as long as it is made by counsel ''in the course of the administration of the law'' both opinions take care to note that the words spoken were ''uttered with reference to, and in the course of, the judicial inquiry'' (Brett, M.R.) and ''with reference to the case which was being heard in the Court.'' (Fry, L.J.)

that case one Bell, an attorney, represented the petitioner in a disbarment action against Youmans. In connection with his preparation for the trial he caused a printer, who became the defendant to the later libel action, to print fifty copies of questions which he thereafter submitted to various prospective witnesses. In the libel action Youmans prevailed in the trial court and the printer appealed. It was conceded that the matter was libelous. The court authoritatively announced that under New York law the privilege applied only "when such words and writings are material and pertinent to the questions involved . . . but such privilege does not extend to matter having no materiality or pertinency to such questions." Nevertheless it was held that the publication of the questions was privileged. The passage quoted below could almost have been written with our case in mind.[13]

---

[13]"Mr. Bell, the author of the words in question, was the attorney for the petitioner in a proceeding duly instituted in a court of competent jurisdiction for the disbarment of the plaintiff. The matter was pending and soon to be tried before a referee, who had power to compel the attendance of witnesses, and to require them to answer under oath such questions as he should deem material. The issue was an unusual one, presenting a broad field of inquiry and involving the personal and professional character of a member of the bar. It was the duty of Mr. Bell to make adequate preparation for the trial, and to anticipate, as far as he could, what questions the referee might allow to be asked both on direct and cross-examination, during an investigation, wide in its scope in any event, and which, through liberal ruling of the referee, or the failure to object by counsel, might embrace almost any question reflecting light upon private character. He could draft 'questions to be asked' so as to adapt them to the changing phases of such a trial and submit the list to witnesses for consideration and reflection before they went upon the stand. *Delany* v. *Jones*, 4 Esp. N.P.R. 191; Flood on Libel and Slander, 156; Holt, 184. While such a course may be open to criticism, there can be no question that he had a strict legal right to do so, provided the questions were confined to such subjects as were, or might become, material during the progress of the trial. As it was reasonable to believe that the attorney proceeded against would be a witness in his own behalf, the usual questions put to impeaching witnesses in relation to character for truth and veracity were clearly material. But Mr. Bell was not compelled to stop there in his preparation of a list of 'questions to be asked.' He had the right to anticipate that witnesses would be called to sustain the character of Mr. Youmans, and to prepare for a thorough cross-examination, which, in a proceeding of this character, would be apt to take a wide range. *Stape* v. *People*, 85 N.Y. 390. As some of the specifications involved accusations of serious crime, which might be sustained by circumstantial evidence, or by the testimony of witnesses of doubtful credit, proof of the general good character of Mr. Youmans might be received, the same as upon the trial of an indictment, in order to rebut the presumption of guilt arising from such evidence by creating a reasonable doubt. *People* v. *Pavlik*, 7 N.Y.Crim.Rep. 30; 2 Rice on Evidence 1242. If a sustaining witness should testify to good character generally, or to good reputation for truth and veracity, and that he would believe Mr. Youmans under oath, it would not be unreasonable to prepare questions for such a witness of the kind complained of in this action. Whether

Closer to home there is of course *Chronicle Publishing Co.* v. *Superior Court*, 54 Cal.2d 548 [7 Cal.Rptr. 109, 354 P.2d 637]. There one Cappa had sued the petitioner newspaper for libel. Cappa was an attorney. In connection with discovery proceedings the Chronicle noticed the deposition, on written interrogatories, of the secretary of the State Bar. Essentially the questions submitted called for any and all complaints which had ever been lodged with the State Bar against Cappa and for any details in connection with such complaints. The State Bar claimed that the records were privileged, that public interest would suffer by disclosure and that the interrogatories were not in proper form. Cappa contended that the specific acts of misconduct would not be admissible and that, therefore, the information sought was not relevant. Dealing with this last contention first, the Supreme Court said: ''Also specific acts, if there are any, could be used in cross-examination of Cappa if he were to testify, as he alleges in his complaint, that he has never been guilty of any misconduct as an attorney. See *People* v. *Westek*, 31 Cal.2d 469 [190 P.2d 9], where in a criminal case where the defendant declared that he had never committed any improper acts on any boy, it was held that as impeachment the prosecution had the right to present responsible evidence tending to contradict the defendant's statement. Likewise, in cross-examining any witness testifying to Cappa's professional reputation, such witness may be asked if he had heard specific reports of misconduct, if such question is asked in good faith. 'In the absence of a showing of bad faith it is always within the scope of legitimate cross-examination to ask a character witness whether he has heard the person whose reputation is under investigation accused of conduct inconsistent with the character attributed to him by the witness.'

---

all of those questions would be strictly competent, even on cross-examination, if objected to, it is unnecessary to decide, *for the attorney had the right to prepare for the contingency, which not unfrequently happens, of having the door of investigation as to character thrown wide open and the challenge broadly made to ask any question relating to the reputation of Mr. Youmans in respect to any subject.* From the nature and extent of the charges, as well as the number of accusing and sustaining affidavits read before the General Term upon the presentation of the petition, it was probable that the deportment and reputation of Mr. Youmans in the community where he lived would be the subject of thorough investigation. In preparing for such a controversy and all its possible variations, we cannot say that any one of the questions under consideration might not become material. We are hence of the opinion that Mr. Bell had the right to draft said questions for use during the trial and in preparing therefor, and that they were privileged in his hands and in the hands of his agents, at least so long as they were used solely for those purposes.'' (*Ibid.*, pp. 220-222. Italics added.)

(*People* v. *McKenna,* 11 Cal.2d 327, 335-336 [79 P.2d 1065].) It must be borne in mind that the Chronicle is not seeking to learn the action of the State Bar in its disciplinary procedure, but information which the State Bar has, which either in itself would be admissible or which might lead to other information which would be admissible. It is not the action of the State Bar that is being sought, but the information upon which the Board of Governors may or may not have imposed discipline.

"The required information was relevant." (*Ibid.,* pp. 560-561.)

While, as noted before, Rhoden's theory of "relation to" the Steele v. Litton litigation is not precisely that of the Supreme Court in *Chronicle Publishing Co.* v. *Superior Court,* in that he does not say he anticipated that Thornton would be as foolish as Westek, we are not confined to his theory. We look at the pleading which the trial court found wanting and ask whether—resolving all doubts in favor of the privilege—the "relation" can be demonstrated. (*Feinstein* v. *Kaye,* 185 Misc. 185, 188 [57 N.Y.S.2d 54, 56-57] ; *Johnston* v. *Schlarb,* 7 Wn.2d 528, 539 [110 P.2d 190, 195, 134 A.L.R. 474] ; *Kemper* v. *Fort,* 219 Pa. 85, 94 [67 A. 991, 995, 123 Am.St.Rep. 623, 12 Ann.Cas. 1022, 13 L.R.A. N.S. 820].) █ "At all events, it is held that doubts are to be resolved in favor of relevancy and pertinency; that is to say, the matter to which the privilege does not extend must be so palpably wanting in relation to the subject matter of the controversy that there can be no reasonable doubt of its impropriety." (Veeder, *Absolute Immunity in Defamation, Judicial Proceedings* (1909) 9 Colum.L.Rev. 463, 600, 612.) █ Thus, without deciding that Rhoden's theory of needing the information to show "good faith" is wrong, it is obvious that the matter was privileged under the reasoning of *Chronicle Publishing Co.* v. *Superior Court, supra.*

Even if, as Thornton's complaint asserts, Rhoden, Steele and Dietrich conspired to fabricate false defamatory matter concerning Thornton, we see no reason for distinguishing the situation from *Chronicle Publishing Co.* v. *Superior Court.* █ If the matter is privileged, it is so regardless of the good faith *vel non* of the defamer. "It [the privilege] protects the attorney from liability in an action for defamation irrespective of his purpose in publishing the defamatory matter, his belief in its truth or even his knowledge of its falsity." (Rest., Torts, § 586, com. a.) In the present case, if the

94

allegations against Rhoden are true, he may have been guilty of conspiracy to commit perjury. (Pen. Code, §§ 31, 118, 182.) The sanctions for such conduct, if proven, would be found in the criminal law and possibly in contempt or disciplinary proceedings. (See Veeder, *op cit.* pp. 470-471.)

Nor, we believe, is *Chronicle Publishing Co.* v. *Superior Court* distinguishable on the basis that there the reputation of Cappa was put in issue by the pleadings, while here Thornton's reputation would become of moment only in connection with his credibility as a witness. The quoted excerpt from the Supreme Court's opinion shows that no such distinction is permissible

### The Abuse of Process Action

The action for abuse of process proceeds on the theory that almost identical facts as those pleaded in the defamation action spell out an abuse of process.

One key allegation was added to those appearing in the complaint in the defamation action and which, it is argued, pleads facts to support the new theory is copied in the footnote.[14]

The parties recognize that *Spellens* v. *Spellens,* 49 Cal.2d 210, 229-233 [317 P.2d 613], is the leading case defining the elements of the tort. (See also *Coy* v. *Advance Automatic Sales Co.,* 228 Cal.App.2d 313, 320 [39 Cal.Rptr. 476] ; *Kyne* v. *Eustice,* 215 Cal.App.2d 627, 632-634 [30 Cal.Rptr. 391] ; *Tellefsen* v. *Key System Transit Line,* 198 Cal.App.2d 611 [17 Cal.Rptr. 919] ; *Pimentel* v. *Houk,* 101 Cal.App.2d 884, 888 [226 P.2d 739] ; *Tranchina* v. *Arcinas,* 78 Cal.App.2d 522, 525 [178 P.2d 65].) They need not be restated here.

Although the giving of a notice that a deposition will be taken is not "process" in the strictest sense of the word[15]

---

[14]"In the commission of the acts hereinabove set forth, defendants, and each of them, utilized the legally authorized processes of discovery and of noticing defendant Dietrich's deposition in a manner not allowed or contemplated by law and, in truth and in fact, abused said processes all to plaintiff's damage as set forth below; plaintiff is informed and believes and upon that ground alleges that defendants, and each of them, did not institute and conduct said deposition for the purpose of gathering facts relevant to the subject matter of said Steele case or for any other purpose authorized or contemplated by law, but did in fact institute and partake in said deposition, cause the same to be transcribed, signed, and filed, and caused the newspaper and wire-service reporters to be notified of the defamatory matter contained therein for the purpose of harassing plaintiff and for the purpose of giving publicity to the defamatory matter concerning plaintiff."

[15]Section 17, subdivision 6 of the Code of Civil Procedure provides as follows: "The word 'writ' signifies an order or precept in writing,

we are inclined to the belief that in a proper case an abuse of the powers which a litigant derives from the taking of a deposition on proper notice gives such notice the status of "process" for the purpose of the tort under consideration. (cf. *Frey & Horgan Corp.* v. *Superior Court,* 5 Cal.2d 401, 403-404 [55 P.2d 203].) We will also assume, without deciding, that the taking of a deposition for the sole purpose of permitting the papers to publicize defamatory matter which they might hesitate to print unless protected by the privilege set forth in section 47, subdivision 4 of the Civil Code and the use of the deposition transcript for the purpose of bringing such matters to the attention of the press, is the type of conduct which is condemned. But, as we see it, the judgment in the abuse of process action must be affirmed even if the law is as we assume it to be.

The complaint in the abuse of process action was filed on December 19, 1963. Defendants, as one of their affirmative defenses, pleaded the bar of section 340, subdivision 3 of the Code of Civil Procedure, the one year statute of limitations applicable to actions of this sort. (*McFaddin* v. *H. S. Crocker Co.,* 219 Cal.App.2d 585, 590 [33 Cal.Rptr. 389]; *Simons* v. *Edouarde,* 98 Cal.App.2d 826, 828 [221 P.2d 203]; see Note 1 A.L.R.3d 953.)[16] It is therefore academic whether the taking of the deposition and the transcribing thereof can be an abuse of process. The only act complained of in the declarations opposing the motion for summary judgment to which the statute of limitations would not be a bar is the filing of the deposition on December 19, 1962, accompanied by the alleged instructions to the process server to notify the press and Rhoden's "courtesy" toward the reporter.

Plaintiff's problem is that his showing that Rhoden did any such thing is fatally defective. In opposition to the motion for summary judgment Thornton filed a declaration of one of his attorneys. The relevant portion is as follows: "On or about January 4, 1963, I telephoned Miss Carol Prager, who I had been advised was the Courthouse reporter for City News

issued in the name of the people, or of a court or judicial officer; and the word 'process' a writ of summons issued in the course of judicial proceedings; . . .''

[16]Even if the cited cases left room for argument that where abuse of process causes damage to property, a longer period of limitations should be applicable, it is evident from the complaint before us that the only damage of which Thornton complains is general damage to his reputation. No special damages are pleaded and the declarations in opposition to defendants' motion for summary judgment are entirely silent on the element of damages.

Service. In our telephone conversation, she confirmed this. I asked Miss Prager if she had any knowledge of the circumstances surrounding the filing of the deposition of Noah Dietrich on December 18,[17] 1962, in *Steele v. Litton Industries, Inc., et al.,* Los Angeles Superior Court No. 732883. She told me that some time between 1:00 and 2:00 p.m. on December 18, 1962, she was in the vicinity of the Civil Filing window and that she saw a process server who [*sic*] she knows by sight, but not by name, but that he told her that he had just filed a deposition involving a $5,000,000 bribe. She said that the clerk at the window then said 'Yes, here it is,' and handed the Noah Dietrich deposition to Miss Prager. Miss Prager said she started to flip through the deposition from back to front, looking for key words that would tell her what the deposition was about, but that this was not satisfactory because of the size of the deposition. She said that she then telephoned Harold Rhoden and asked him if he had the page numbers where she could find the 'Howard Hughes matter' and that Mr. Rhoden then gave her the page numbers pertaining to, according Miss Prager, 'Hughes, the air force deal and the accounting system.' Miss Prager also told me that she had subsequently been advised by other Courthouse reporters that, on December 18, 1962, the aforesaid process server had come into the Courthouse pressroom at approximately 1:00 to 2:00 p.m. and told the reporters there that he had been instructed to notify them of the filing of the deposition. Miss Prager told me that she did not want to become involved in the litigation and would not give a signed statement and would testify only if subpenaed.'' Obviously, this is hearsay on the point of the process server's having stated to the reporter that he had filed a deposition involving a $5,000,000 bribe and also on the reporter's call to Rhoden. It is hearsay on hearsay on the process server's statement to other reporters that he had been instructed to notify them of the filing of the deposition and triple hearsay on the fact of his instructions.

Thornton's counsel excuses the failure to file competent declarations by pointing to the fact that before defendants filed their motion for summary judgment, both parties had been ordered not to initiate any further discovery proceedings.

---

[17]The complaint alleges and the answer admits by failure to deny that the deposition was filed on December 19. Since the trial court could take judicial notice of its own files, we may do the same and we have satisfied ourselves that December 19 is the correct date.

Therefore, it is argued they were unable to support their opposition to the motion for summary judgment with a deposition of Miss Prager who refused to give a signed statement.

No attempt was made to seek relief from the order precluding discovery. It is improbable that the court would have refused to modify its order if shown that Thornton needed a deposition to resist the motion for summary judgment filed several months after the order. Be that as it may, we will give Thornton the benefit of the doubt and consider the declaration as being Miss Prager's.

All she knows from her own knowledge is that the process server told her that he had filed a deposition involving a $5,000,000 bribe. There is absolutely nothing to indicate that he did so under instructions from Rhoden. Authority to hold a press conference can hardly be inferred from instructions to file. She also knows from her own knowledge that she talked to Rhoden and that at her request he gave her certain page numbers in the deposition. It is hard to see how this telephone call, initiated by a member of the press, and Rhoden's compliance with a specific request for page numbers is evidence of the purposeful abuse of which Thornton complains. As far as the alleged statement of the process server to other reporters that he had been instructed to notify them of the filing of the deposition is concerned, it is not shown that Miss Prager refused to divulge their names or the name of the process server or that the process server refused to sign a declaration concerning his instructions or activities.

Thornton therefore failed to show that there was a triable issue of fact concerning the only act of any of the defendants which by any stretch of the imagination could be deemed to be an abuse of process.

### Other Contentions

Thornton asserts, however, that the validity of his abuse of process theory must be determined from the allegations in the defamation action to which the statute of limitations is not a bar and that in that action, which was decided on demurrer, the allegations in the complaint must be accepted as true.

There are several answers to this contention.

First: the first amended complaint in the defamation action simply does not allege facts sufficient to constitute a cause of action for abuse of process. The charging allegation copied in footnote 14 is absent. True, on December 3, 1963, Thornton filed a notice of motion for an order permitting the filing of a

second amended complaint which contained allegations which, standing alone, we assume to be adequate in setting forth a cause of action on the abuse of process theory. This motion was denied and as we have noted there is no contention made in this court that the denial—or the denial of a later attempt to file a third amended complaint—constituted an abuse of discretion. However, since it is inferrable from the record before us that these denials were predicated solely on the trial judge's belief that the proposed amended complaints did not state a cause of action for either defamation or abuse of process, we proceed to other reasons why we should not reverse the judgment in the defamation action.

Second: assuming again that the allegations quoted in footnote 14 coupled with the rest of the pleaded facts, including the orders to and activities of the process server adequately set forth facts essential to a cause of action for abuse of process, we do not believe that in the unusual situation in which these consolidated appeals reach us we should blindly adhere to the rule that the allegations of a complaint must be accepted as true. The situation is somewhat parallel to the one in which the Supreme Court found itself in *Southern Pac. Co.* v. *City of Los Angeles,* 5 Cal.2d 545 [55 P.2d 847]. There the court had before it at the same time two appeals from different trial courts which had reached different conclusions on the question whether the defendant city had been negligent in the construction and maintenance of its aqueduct. Having affirmed the court which had found against the city (*Inyo Chemical Co.* v. *City of Los Angeles,* 5 Cal.2d 525 [55 P.2d 850]), the court proceeded to the consideration of the appeal in the case which the city had won. It set aside the trial judge's finding although admittedly based on substantial evidence, stating that the rule ''that a reviewing court is bound by the findings of the trial court on conflicting evidence cannot apply to a situation such as this . . .'' (*Ibid.,* p. 548.)[18] Similarly we believe that we should not have to accept as true Thornton's allegations about the only act which could be determined to be an abuse of process—the instructions to the process server and his compliance therewith—when we know from the declarations in the abuse of process action that Thornton cannot prove them.

Third: disregarding the allegations of the process server's

[18]Compare also the rule that a demurrer does not admit facts the falsity of which can be judicially noticed. (*People* v. *Oakland Water Front Co.,* 118 Cal. 234, 244-245 [50 P. 305].)

instructions and actions, neither the proposed second amended nor the proposed third amended complaint in the defamation action states sufficient facts in the proposed abuse of process counts therein. This is so for two reasons each adequate by itself.

It is obvious that except for the post-filing publicity everything done by Rhoden or caused to be done by him was an integral part of the deposition proceedings he had initiated by notice. We have held these facts to be absolutely privileged in a defamation action. ▇▇▇ The salutary purpose of the privilege should not be frustrated by putting a new label on the complaint. If it is desirable to create an absolute privilege in defamation, not because we desire to protect the shady practitioner, but because we do not want the honest one to have to be concerned with libel or slander actions while acting for his client, we should not remove one concern and saddle him with another for doing precisely the same thing. As the Queen's Bench Division said in *Munster* v. *Lamb, supra*: "It was at one time suggested that although witnesses could not be held liable to actions upon the case for defamation, that is, for actions for libel and slander, nevertheless they might be held liable in another and different form of action on the case, namely, an action analogous to an action for malicious prosecution, in which it would be alleged that the statement complained of was false to the knowledge of the witness, and was made maliciously and without reasonable or probable cause. This view has been supported by high authority; but it seems to me wholly untenable. If an action for libel or slander cannot be maintained, how can such an action as I have mentioned be maintained, it being in truth an action for defamation in an altered form? Every objection and every reason, which can be urged against an action for libel or slander, will equally apply against the suggested form of action." (*Ibid.*, pp. 601-602.)

We appreciate that in *Albertson* v. *Raboff,* 46 Cal.2d 375 [295 P.2d 405] the Supreme Court, after holding that the recordation of a *lis pendens* was absolutely privileged as far as an action for slander of title is concerned, also held that if the action in which the *lis pendens* had been recorded resulted in a termination favorable to the party aggrieved thereby, a cause of action for malicious prosecution could be stated. "The policy of encouraging free access to the courts that underlies the absolute privilege applicable in defamation actions is outweighed by the policy of affording redress for individual

wrongs when the requirements of favorable termination, lack of probable cause, and malice are satisfied.'' (*Ibid.*, p. 382.) Since lack of probable cause and malice do not destroy an absolute privilege in defamation, the result in *Albertson* must have hinged on the additional requirement of favorable determination. No analogous additional element is pleaded here or can be proved.

██ But even if we disregard the privilege, it is obvious that just taking the ordinary steps in connection with the taking, transcribing and filing of the deposition cannot be an abuse of process. Dean Prosser, in a passage which has several times been quoted in appellate opinions, says this: ''Some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process, is required; and there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions.'' (Prosser on Torts (3d ed.) p. 877; *Coy* v. *Advance Automatic Sales Co.,* 228 Cal.App.2d 313, 318-321 [39 Cal.Rptr. 476].)

Rhoden argues that each appeal is frivolous and suggests sanctions. We disagree.

The judgments and each of them are affirmed.

Shinn, P. J., and Ford, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 16, 1966. McComb, J., did not participate therein.