76 P.3d 741 (2003)
118 Wash.App. 383
Stephen K. EUGSTER, and Cheryl L. Rodgers, Appellants,
v.
CITY OF SPOKANE, Spokane Parking Public Development Authority, Spokane Downtown Foundation, Citizens Realty Co., Lincoln Investment Company, River Park Square L.L.C., R.P.C. II, National Association, Respondents.
No. 21853-8-III.
Court of Appeals of Washington, Division 3, Panel Eight.
September 16, 2003.
*746 Jerry L. Trunkenbolz, Trunkenbolz, Rohr PLLC, Laurel H. Siddoway, Michael L. Wolfe, David Groesbeck, Jillian A. Grabicki, Randall & Danskin, Spokane, WA, Margery Bronster, Bronster, Crabtree & Hoshibata, Honolulu, HI, John F. Bury, Stephen K. Eugster, Eugster Law Offices PSC, Christopher M. Grimes, Ford & Grimes PS, Spokane Valley, WA, for Appellant.
William F. Etter, Raymond F. Clary, Etter, McMahon, Lamberson & Clary PC, Leslie R. Weatherhead, Robert S. Magnuson, Christopher G. Varallo, Witherspoon, Kelley, James B. King, John D. Munding, Spokane, WA, Alain M. Baudry, Masion, Edelman, Borman & Brand, Minneapolis, MN, Michael F. Connelly, Milton G. Rowland, City Attorney's Office, Spokane, WA, for Respondent. *742 *743 *744
*745 BROWN, C.J.
Today, we consider another dispute involving the public parking garage portion of Spokane's River Park Square shopping mall. The core issue is whether the superior court erred by issuing a writ of mandamus directing the City of Spokane to abide by an ordinance providing a contingent loan of parking meter revenue to cover garage expense shortfalls. We hold the City has a duty under the ordinance to offer the loan. We agree no material fact issues remained requiring a mandamus trial. Further, we reject contentions seeking to nullify the ordinance centered on alleged violations of the Open Public Meetings Act (OPMA) and the Ethics in Government Act. Accordingly, we affirm.

FACTS

A. Parties
The parties in this continuing River Park Square controversy include the City of Spokane (City); Citizens Realty Company, Lincoln Investment Company, and River Park Square L.L.C., the mall owners and developers (Developer); the Spokane Downtown Foundation (Foundation), the non-profit corporation created by the developers specifically to issue bonds to finance purchase of the garage; the Spokane Public Development Authority (PDA), the public corporation charged with operating the garage; bond trustee U.S. Bank (USB); Stephen Eugster, a City Council member and longtime critic of the project; and City Council member Cheryl (Cheri) Rodgers.

B. Early Garage Financing Concepts
In June 1995, the Spokane City Council passed a resolution directing city officials to work on a proposal for acquisition and development of a public parking garage in connection with the private redevelopment of the River Park Square. The proposal involved issuing revenue bonds "to be repaid over twenty-five years exclusively from parking garage revenues." Clerk's Papers (CP) at 2764. The resolution provided the City would lease the land under the parking garage from the land owner/private developer, *747 and the lease would be "paid by revenues derived from the operation of the public parking garage." CP at 2765.
On October 17, 1996, the Spokane City Council considered a detailed proposal involving the City's issuance of bonds to purchase the garage. A representative of the bond underwriter explained that parking garage revenues would "flow down" first, to pay "all the operation and maintenance expenses of the facility." CP at 2765. "After the payment of operation and maintenance expenses, debt service requirements on this issue comes first. After that it's been structured to state that ground lease payments would be made to the developer." CP at 2765.[1] Later, the City abandoned its plan to issue bonds, and elected to issue them through the Foundation.

C. Origins of the Current Garage Financing Structure
On November 25, 1996, the Spokane City Council passed a resolution authorizing the city manager and city staff "to prepare the ordinances, agreements and documents jointly with" the PDA and Foundation "as are necessary to provide for the renovation, expansion and construction" of the garage. CP at 1196. The resolution additionally directed the city staff "to meet with the Foundation and its counsel and to do all things necessary and appropriate in order for it to recommend action to the Council in conjunction with" the redevelopment project, issuance of bonds, and the eventual transfer of the garage to the City. CP at 1196. The resolution also directed the city staff "to do all things necessary and appropriate" to procure a favorable bond rating for the proposed bonds. CP at 1196.
The resolution further directed the city staff "to prepare the resolution and/or ordinance necessary to accomplish" the City's contingent pledge of parking meter revenues to the PDA "for the sole purposes of supporting the Authority's activities including paying operating and maintenance expenses and ground rent payments in connection with the Facility." CP at 1197. During at least one November 1996 City Council meeting, some discussion took place between unidentified speakers regarding separating out the parking meter revenues for the purpose of paying garage operating expenses but not for payments on the bonds.

D. Presentation of Draft Ordinance
The January 13, 1997 City Council meeting addressed resolutions and a draft ordinance concerning the new garage financing plan. Regarding the City's contingent pledge of parking meter revenue, the City's bond counsel, Roy Koegen, stated:
[T]he way the contingent pledge works is the studies that have been done by professional parking consultants have indicated that the revenues from the park [sic] garage itself will be more than sufficient to repay all expenses incident to the garage, debt service, lease payments and operating expenses.
However, the capital markets look with some askance on stand-alone parking garages. So in order to obtain an investment grade rating, the City of Spokane has agreed to loan money, and it's a loan, not a grant, to the public development authority if the parking revenues that the authority would collect aren't sufficient to pay ground lease payments and operating expenses.
The purpose was to give more security to the public development authority in its agreement to pay operating expenses and ground lease payments.
CP at 2647.
In response to a question from the Council, Mr. Koegen clarified:
[Parking meter revenue] will not leave the City of Spokane at any time unless the revenues received by the public development authority from the garage and only at that time are insufficient to *748 pay, again, only lease payments and operational costs.
There's not an obligation on behalf of the city to make any deposits or to accumulate any money, it's only available if and only if the garage revenues are insufficient and, again, only insufficient to make rent or lease payments and operating costs, not debt service.
CP at 2648. City attorney Stanley Schwartz stated, regarding the parking meter fund, "I should note that if this fund is called upon or is utilized, monies will be repaid in more profitable years, and that is called for in the development documents." CP at 2649.
Betsy Cowles, the Developer's president, then explained to the City Council that private investors would buy the bonds issued by the Foundation, and "it is garage revenue that will repay those bonds." CP at 2650. Regarding the use of parking meter revenue, Ms. Cowles stated:
The city is contingently pledging parking meter revenue, not tax money, and they're pledging it to the PDA. That money will only be used if the garage revenue is insufficient to cover land rent, operation and maintenance, and that is highly unlikely to happen, as Mr. Koegen pointed out.
CP at 2650. Later, Ms. Cowles continued:
The projections for this garage, and the city again acting responsibly, has discounted the projected revenues by almost 25 percent. Even under this scenario, even under that significant discount of what the Walker [Parking Consultants] study says this garage is going to bring in, there is going to be revenue to pay back the debt service, to pay the lease payments, to pay operation and maintenance.
CP at 2651.
The City Council then passed Resolution No. 97-2, which partly approved the Foundation's plan to purchase the garage with bond proceeds.

E. Consideration of Ordinance
At the January 27, 1997 City Council legislative meeting, financial consultant Coopers & Lybrand presented a written analysis of the garage project, partly stating:
The operating income from the RPS [River Park Square] Garage will be allocated first to cover debt service on the bonds, then to obligations under the ground lease and then to pay operating expenses. To the extent revenues from the RPS Garage are insufficient to pay bond debt service, ground lease payments and operating expenses, the City has agreed to pledge parking meter revenues to meet ground rent and operating expenses of the RPS Garage. It is our understanding that this pledge will be in the form of a loan, to be repaid from the operations of the RPS Garage in subsequent years, if available. It is also our understanding that revenues from parking meters will not be used to guarantee debt service payments on the bonds. However, this credit enhancement with respect to covering ground lease and operating expenses, results in the ability to obtain an investment grade bond rating, according to the Developer.
CP at 1269.
The analysis later summarized that debt service on the bonds would have priority with respect to garage revenues. "Ground lease payments and operating and maintenance expenses of the RPS Garage are subordinate to the bond payments." CP at 1274. Regarding the loan of parking meter revenues, the analysis emphasized:
It is important to note that the parking meter revenues pledged by the City are intended to cover ground lease payments and operating and maintenance expenses of the garage only, and will not be used to fund debt service obligations under the bonds. To the extent that the revenues from the RPS Garage are insufficient to meet the debt service requirements of the bonds and a default occurs, the bondholders could pursue foreclosure, taking title to the property.
CP at 1274.
Mr. Schwartz presented the proposed ordinance, explaining "[t]here is a contingent pledge of the parking meter revenues to the parking development authority for the parking garage operation, maintenance, and ground lease." CP at 2653. Answering a question from the Mayor, Mr. Schwartz clarified the contingent pledge of parking meter *749 revenue "is not going toward debt, as you have been told, it's only going toward the maintenance, operational and ground lease responsibilities." CP at 2653. The Mayor asked, "[t]hat has to do with the potential bond buyers feeling much more comfortable with how this thing works?" CP at 2653. Mr. Schwartz answered, "Correct." CP at 2653. Ordinance No. C31823 (ordinance) was then enacted.

F. The Ordinance
In the ordinance, the City acknowledged both that the Foundation would issue tax-exempt bonds to finance reconstruction of the River Park Square parking garage (garage or facility) and would acquire the garage from the Developer. The Developer would retain ownership of the ground under the garage, but would lease that ground to the Foundation (ground lease). The Foundation would then lease the garage (facility lease) and sublease the ground (ground sublease) to the PDA. The ordinance contemplates the City acquiring full legal title to the garage and a leasehold interest in the ground under the garage once the Foundation paid off the bonds.
The ordinance partly states: "[T]he Council is desirous of creating a parking meter revenue fund, into which parking meter revenue will be deposited and contingently pledged to pay Operating Expenses of the Facility and Ground Lease Payments in the event that Facility revenues are insufficient, thereby ensuing the Facility is maintained in a first-class condition." CP at 126-27. Per the ordinance:
The City hereby pledges, as a first charge and lien, that, in the event Parking Revenues are insufficient to make Ground Lease Payments and pay Operating Expenses, the City shall loan money from the Parking Meter Revenue Fund (but only to the extent money or investments are then on deposit or allocable to the Parking Meter Revenue Fund) to the Authority's Ground Lease Account and Operating and Maintenance Account in an amount that is no more than is necessary, together with such other money as is on hand and available in the Ground Lease Account and the Operating and Maintenance Account, to permit the Authority to make Ground Lease Payments and to pay Operating Expenses. The City covenants to maintain parking meter rates at a level to produce an amount each year that, together with other legally available money loaned to the Parking Meter [Revenue] Fund, will equal Ground Lease Payments and Operating Expenses budgeted for that year. Notwithstanding the foregoing, the City specifically does not: (i) pledge to maintain money in the Parking Meter Revenue Fund; (ii) pledge revenue derived from the enforcement of City parking laws to the Parking Meter Revenue Fund or any transfer therefrom; (iii) pledge the City's full faith, credit and resources, or money in the City's General Fund to the payment of Ground Lease Payments or Operating Expenses; or (iv) pledge any assets of the City to the payment of principal of or interest on the Foundation's Bonds.
CP at 132.
The ordinance further states: "The public purposes of this Ordinance will be lost if assurances of City participation, including a contingent pledge of its Parking Meter Revenue to pay Operating Expenses and Ground Lease Payments, are not immediately made and effective upon passage of this Ordinance." CP at 133. An unsuccessful challenge to the constitutionality of the ordinance soon followed. See CLEAN v. City of Spokane, 133 Wash.2d 455, 947 P.2d 1169 (1997).

G. Leases Executed
Apparently, on August 1, 1998, the Foundation executed the ground lease with the Developer. In the "Fixed Ground Rent" section, the lease partly states:
Foundation agrees that the revenue from the Parking Facility shall be applied by the Foundation in the following order of priority: debt service on the Bonds issued by the Foundation for purchase of the Parking Facility, Fixed Ground Rent, operational and maintenance expenses of the Parking Facility, and Administrative Variable *750 Ground Rent and reserve accounts described in Paragraph 4.2 herein.
CP at 137.
In Paragraph 4.4, the lease provided that the PDA must apply parking facility revenue first to "Fixed Facility Rent," then, in descending priority, fixed ground rent, and operating expenses. CP at 138.
Apparently, also on August 1, 1998, the Foundation and the PDA entered an agreement for the lease of the garage structure to the PDA (facility lease). Regarding parking revenue, the purported facility lease in the record partly states:
All Parking Revenues shall be deposited into the Revenue Account as collected and, together with amounts transferred to the Revenue Account from the Rate Stabilization Account and City loan proceeds and Parking Meter Revenues loaned to the Authority by the Authority by the City, shall be used only for the following purposes and in the following order of priority:

First, to pay Fixed Facility Rent;

Second, to pay Fixed Ground Rent;

Third, to pay Operating Expenses;
CP at 1594.

H. Garage Problems
The Foundation issued approximately $31 million in bonds in September 1998. The Foundation then used approximately $26 million of the proceeds to buy the garage from the Developer. But an October 1998 City memorandum, citing clerical errors, alleged the "value for the parking garage should be reduced from $26,050,713.71 to $14,527,271.28." CP at 2607.
The projected parking charges posed another problem for the Developer. A major prospective tenant, AMC theaters, wanted free patron parking. A compromise resulted in a generous parking validation discount program for mall patrons generally.
In August 1999, the PDA sent a letter to the Foundation's law firm registering its concern that a recent analysis by Walker Parking Consultants projected an annual revenue shortfall of approximately $1,240,000. The projection proved generally correct; the garage has consistently lost money since it opened.

I. First Mandamus: RPS v. Miggins

In spring 2000, after initially making startup loans of approximately $280,000, the City refused to make further loans to make up for the growing shortfall in garage revenues. By then, John Talbott, an opponent of the City's involvement in the development project had been elected mayor. And, Mr. Eugster, a critic of the project had been elected to the City Council. The loan refusals led to River Park Square, L.L.C. v. Miggins, 143 Wash.2d 68, 72, 17 P.3d 1178 (2001).
The Developer, not the PDA, "applied for a writ of mandamus to compel the City Manager and the City Attorney to issue the loan." Id. The superior court granted the writ after a show cause hearing. "The trial court reasoned that Ordinance C31823 mandates that the City Manager and the City Attorney issue a loan when revenues to pay the ground lease payment and operating expenses are deficient, and there is no plain, speedy, and adequate remedy in the ordinary course of law." Id. The Supreme Court granted direct review. On February 15, 2001, the Supreme Court quashed the superior court's writ of mandamus, holding "[t]he writ should not issue because Ordinance C31823 does not especially enjoin the City Manager and the City Attorney to act as a result of their office." Id. at 76, 17 P.3d 1178.[2]

J. Current Litigation and Appeal
On July 24, 2000, Mr. Eugster and fellow city council member Ms. Rodgers filed a complaint for declaratory judgment against a number of parties including the City, the Developer, and U.S. Bank (USB). The complaint mainly sought to have the ordinance declared null and void on grounds for a number *751 of reasons, including a generally worded allegation of violations of the OPMA.[3]
On June 15, 2001, the Developer filed an answer, counterclaim, cross-claim, third-party claim, and jury trial demand in response to the complaint. The Developer alleged 11 counterclaims against the City, Mayor Talbott, and individual city council members, including Mr. Eugster and Ms. Rodgers. One of the counterclaims alleges breach of contract and demands specific performance. The Developer claimed, "[t]he City's obligations under the contract are unique and specific: to make a loan to enable the PDA to meet specified obligations. Specific performance is necessary and appropriate to compel performance." CP at 112. The Developer also claimed promissory estoppel and detrimental reliance, alleging "RPS has been damaged in an amount exceeding $2 million by the City's failure to honor its pledge. Injustice can only be avoided through the Court's enforcement of the City's obligations under the Ordinance." CP at 113. Alternatively, the Developer requested a writ of mandamus to compel the Mayor and City Council to loan parking meter revenue to the PDA.
In its prayer for relief, the Developer partly requested, "[t]hat Defendant City be estopped from reneging on promises and obligations contained in the Ordinance and other representations," that "Defendant City be required to specifically perform its obligations under the Ordinance," and that, alternatively, the trial court issue a writ of mandamus commanding the Mayor and City Council to loan parking meter revenue to the PDA. CP at 122-23. The City moved to dismiss the Developer's claims.
On October 17, 2001, Mr. Eugster filed a motion for partial summary judgment seeking to have the ordinance and other City actions declared null and void because of alleged violations of OPMA. On November 30, 2001, the Developer filed a cross-motion for summary judgment urging the trial court to dismiss the OPMA claims.
On December 21, 2001, the superior court denied the City's motion to dismiss the Developer's mandamus claim. The trial court's memorandum opinion reasoned the City's contingent promise to loan parking meter revenue to the PDA was a non-discretionary, compulsory act under the ordinance. The court partly reasoned:
It is premature to say that the Developers have other remedies available. The Supreme Court in Miggins stated there was no adequate remedy at law. Judge Donohue [the trial court judge in Miggins] articulated the issue as "`... [W]hether there is a plain, speedy, and adequate remedy in the ordinary course of law.'" Herein, the City did not assert that alternative remedies are speedy or plain. Lastly, until the Court addresses the alternative claims, remedies are theoretical at best.
CP at 843. In its memorandum opinion, the trial court concluded:
The City further seeks to dismiss the Developers' mandamus claim due to the existence of other plain, speedy, and adequate remedies. The Developers have asserted 11 different claims, none of which compel the City to make the loan pursuant to City Ordinance C-31823. There being no other speedy, plain, and adequate remedy at law available to the Developers, it is appropriate to deny the City's Motion to Dismiss the Developers' Mandamus Claim.
CP at 845-46.
On January 31, 2002, the superior court dismissed without prejudice the Developer's counterclaims for tortious interference, and due process violations against the City and individual city council members. The trial court did not dismiss the Developer's other counterclaims, including mandamus.
On February 14, 2002, the Developer filed a second amended answer, counterclaims, and cross-claims partly reinstating the previously *752 dismissed claims. The renewed prayer for relief repeated the Developer's earlier requests for estoppel relief, specific performance, and the alternative remedy of mandamus. Concurrently, the Developer filed an application for writ of mandamus and motion for partial summary judgment. The Developer supported the application with the affidavit of Steven Rector, the Developer's Secretary-Treasurer. Mr. Rector's affidavit referenced attached exhibits documenting the amounts the PDA allegedly owed the Developer.
The trial court immediately issued the alternative writ of mandamus directing the City to loan "$3,344,856.60 from the City's parking meter revenue fund to the PDA, to enable it to make outstanding ground lease payments and pay operating expenses of the facility," or to show cause why it would not comply. CP at 932. The PDA joined the Developer's writ application on March 12, 2002.
On March 22, 2002, the trial court ordered the City by peremptory writ of mandamus "to forthwith loan money pursuant to the Ordinance, from the City's parking meter revenue fund to the PDA in the amount of $3,344,856.60, representing the amount of the outstanding ground lease payments and operation and maintenance costs relating to the facility." CP at 1324. Concurrently, the trial court issued a memorandum opinion, which incorporated the trial court's December 21, 2001 memorandum opinion as a declaratory judgment. The trial court denied Mr. Eugster's motion for partial summary judgment and granted the Developer's cross-motion for summary judgment dismissing Mr. Eugster's and Ms. Rodgers' claims.
Mr. Eugster, Ms. Rodgers, and the City sought direct review at the Supreme Court. Although the Developer and USB did not oppose direct review, the Supreme Court transferred the appeal to this court in March 2003.

K. Federal Litigation
In the meantime, related litigation has been ongoing before the United States District Court for the Eastern District of Washington.[4] On April 24, 2001, several institutions representing bondholders filed suit against a number of defendants, including the Developer and the City, Nuveen Qual. Income Mun. Fund, Inc, et al. v. Prudential Securities Inc., et al., Case No. CS-01-0127-JLQ. The bondholders asserted fraud claims under federal and state securities laws, common law fraud claims, and negligent misrepresentation claims. On November 19, 2001, the federal court denied the Developer's motion to dismiss the bondholders' action.
In December 2002, the federal court granted in part a motion to dismiss a number of the City's cross-claims, including contract defenses, for lack of subject matter jurisdiction. The federal court partly reasoned that allowing the City to prevail on the basis of its asserted contract defenses would improperly require the federal court to hold the ordinance invalid and thus reverse the writ of mandamus. But the federal court would not dismiss the City's four other cross-claims for damages. At the June 2003 argument, we learned the federal bondholder action is slated to go to trial in April 2004.

ISSUES
The primary issue is whether the trial court erred in issuing a writ of mandamus directing the City to loan funds from the parking meter revenue fund to the PDA.[5] *753 Next we decide whether the trial court erred in summarily dismissing the OPMA and Ethics in Government Act claims. Lastly, we address Mr. Eugster's attorney fee claims.

ANALYSIS

A. Mandamus
"We note at the outset that mandamus is an extraordinary writ." Walker v. Munro, 124 Wash.2d 402, 407, 879 P.2d 920 (1994). A court may issue a writ of mandamus, "to any inferior tribunal, corporation, board or person, to compel the performance of an act which the law especially enjoins as a duty resulting from an office, trust or station." RCW 7.16.160. "The writ must be issued in all cases where there is not a plain, speedy and adequate remedy in the ordinary course of law. It must be issued upon affidavit on the application of the party beneficially interested." RCW 7.16.170. If disputed material fact issues exist, the trial court has discretion to hold a trial before it determines the appropriateness of mandamus. RCW 7.16.210.
The above legal framework requires the applicant to satisfy three elements before a writ will issue: (1) the party subject to the writ is under a clear duty to act, RCW 7.16.160; (2) the applicant has no "plain, speedy and adequate remedy in the ordinary course of law," RCW 7.16.170; and (3) the applicant is "beneficially interested." RCW 7.16.170. This dispute mainly involves the first two elements: the City's duty; and the availability of other remedies.
First, Mr. Eugster strikes a blow at the "beneficially interested" element, which involves the concept of standing. See Retired Pub. Employees Council v. Charles, 148 Wash.2d 602, 616, 62 P.3d 470 (2003) (noting that applicant for writ has standing if the applicant is beneficially interested in the duty asserted). Here, the Developer owns the land under the garage and has a rental interest; USB, as the bondholders' representative looking to the loan as security for the bondholders, "has an interest in the action beyond that shared in common with other citizens." Retired Pub. Employees Council, 148 Wash.2d at 616, 62 P.3d 470 (citing State ex rel. Lay v. Simpson, 173 Wash. 512, 513, 23 P.2d 886 (1933)). Thus, both the Developer and USB are beneficially interested and have standing. Our remaining focus is duty and remedy.
As noted, the applicant bears the "demanding" burden of proving all three elements justifying mandamus. Mallard v. U.S. Dist. Court for S. Dist. of Iowa, 490 U.S. 296, 309, 109 S.Ct. 1814, 104 L.Ed.2d 318 (1989). Different review standards apply to the duty and lack of remedy elements:
The determination of whether a statute specifies a duty that the person must perform is a question of law. Whether there is a plain, speedy, and adequate remedy in the ordinary course of the law is a question left to the discretion of the court in which the proceeding is instituted.

River Park Square, L.L.C. v. Miggins, 143 Wash.2d 68, 76, 17 P.3d 1178 (2001) (citing State ex rel. Hodde v. Superior Court, 40 Wash.2d 502, 517, 244 P.2d 668 (1952)). Thus, we "will not disturb a decision regarding a plain, speedy, and adequate remedy on review unless the superior court's discretion was manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." River Park Square, 143 Wash.2d at 76, 17 P.3d 1178 (citing State ex rel. Carroll v. Junker, 79 Wash.2d 12, 26, 482 P.2d 775 (1971)).
1. Duty Element. The City contends it has no clear mandatory duty to issue the loan, and even if it has, the loan should issue solely where garage parking revenues are insufficient before servicing of the bond debt. The Developer argues the City's duty is mandatory and the ordinance allows garage revenue to flow first to debt service on the bonds for purposes of determining the shortfall contingency.
Mandamus is appropriate to compel a government official or entity "to comply *754 with law when the claim is clear and there is a duty to act." In re Pers. Restraint of Dyer, 143 Wash.2d 384, 398, 20 P.3d 907 (2001) (citing Walker v. Munro, 124 Wash.2d 402, 408, 879 P.2d 920 (1994)). Ordinarily, duty is a threshold element; if the claim is clear and the government entity has a duty to act, mandamus may be an appropriate remedy. See Wash. State Labor Council v. Reed, 149 Wash.2d 48, 55-56, 65 P.3d 1203 (2003); State ex rel. Heavey v. Murphy, 138 Wash.2d 800, 804-05, 982 P.2d 611 (1999); Dep't of Ecology v. State Fin. Comm., 116 Wash.2d 246, 252, 804 P.2d 1241 (1991). If so, regarding duty, the question becomes whether the circumstances trigger the duty. See Murphy, 138 Wash.2d at 805, 982 P.2d 611; Dep't of Ecology, 116 Wash.2d at 252, 804 P.2d 1241. Then, remedy is considered.
Doubtful plaintiff rights do not justify a writ of mandamus. United States ex rel. Arant v. Lane, 249 U.S. 367, 371, 39 S.Ct. 293, 63 L.Ed. 650 (1919); In re Life & Fire Ins. Co. v. Heirs of Wilson, 33 U.S.(8 Pet.) 291, 302-03, 8 L.Ed. 949 (1834). Mandamus writs should not be issued to direct a general course of conduct. Walker, 124 Wash.2d at 407, 879 P.2d 920. Mandamus does not authorize a court "to assume general control or direction of official acts." State ex rel. Taylor v. Lawler, 2 Wash.2d 488, 490, 98 P.2d 658 (1940); see also Walker, 124 Wash.2d at 407, 879 P.2d 920. "Instead, the remedy of mandamus contemplates the necessity of indicating the precise thing to be done." Walker, 124 Wash.2d at 407, 879 P.2d 920 (citing Clark County Sheriff v. Dep't of Social & Health Servs., 95 Wash.2d 445, 450, 626 P.2d 6 (1981); State ex rel. Hawes v. Brewer, 39 Wash. 65, 80 P. 1001 (1905)).
"This does not mean that a writ cannot issue in regards to a continuing violation of a duty." Walker, 124 Wash.2d at 408, 879 P.2d 920. "Where there is a specific, existing duty which a state officer has violated and continues to violate, mandamus is an appropriate remedy to compel performance." Id. (citing Clark County Sheriff, 95 Wash.2d at 450, 626 P.2d 6).
Mandamus can direct an officer to exercise a mandatory discretionary duty, but not the manner of exercising that discretion. Peterson v. Dep't of Ecology, 92 Wash.2d 306, 314, 596 P.2d 285 (1979). Thus, a mandamus applicant cannot exactly shape a mandatory discretionary act. Dyer, 143 Wash.2d at 398, 20 P.3d 907; State ex rel. Burlington N., Inc. v. Wash. Utils. & Transp. Comm'n, 93 Wash.2d 398, 410, 609 P.2d 1375 (1980); Washam v. Sonntag, 74 Wash.App. 504, 507, 874 P.2d 188 (1994). Similarly, "[a]lthough mandamus will not lie to control exercise of discretion, it will lie to require that discretion be exercised." Whitney v. Buckner, 107 Wash.2d 861, 865, 734 P.2d 485 (1987) (citing Bullock v. Superior Court, 84 Wash.2d 101, 103, 524 P.2d 385 (1974)). And, "[t]he act of mandamus compels performance of a duty, but cannot lie to control discretion." Dyer, 143 Wash.2d at 398, 20 P.3d 907 (Benedict v. Bd. of Police Pension Fund Comm'rs, 35 Wash.2d 465, 475, 214 P.2d 171 (1950)).
In terms of duty, mandamus, if appropriate, tells the respondent what to do, but not how to do it. Here, the specific duty the Developer asserts the City has failed to perform is to offer a loan to the PDA to cover arrearages in ground rent and operating expenses as provided under the ordinance. If the Developer's duty claim is clear, mandamus is an appropriate remedy provided the Developer satisfies the other elements. Dyer, 143 Wash.2d at 398, 20 P.3d 907; Walker, 124 Wash.2d at 408, 879 P.2d 920.
The City's duty to loan money to the PDA turns on the meaning of the ordinance. We review the interpretation of a city ordinance "de novo under the error of law standard." Hatley v. City of Union Gap, 106 Wash.App. 302, 307, 24 P.3d 444 (2001) (citing Peter Schroeder Architects v. City of Bellevue, 83 Wash.App. 188, 191, 920 P.2d 1216 (1996)). The interpretation rules apply equally to municipal ordinances and statutes. World Wide Video, Inc. v. City of Tukwila, 117 Wash.2d 382, 392, 816 P.2d 18 (1991); City of Spokane v. Fischer, 110 Wash.2d 541, 542, 754 P.2d 1241 (1988); City of Puyallup v. Pac. Northwest Bell Telephone Co., 98 Wash.2d 443, 656 P.2d 1035 (1982).
*755 Generally, we interpret the ordinance "to best advance" the municipality's legislative purpose. State v. C.J., 148 Wash.2d 672, 685, 63 P.3d 765 (2003) (citing Morris v. Blaker, 118 Wash.2d 133, 143, 821 P.2d 482 (1992)). We begin our analysis with a plain meaning interpretation of the language on the face of the ordinance and closely related legislation in light of the municipality's underlying legislative purposes. See Wash. Public Ports Ass'n v. Dep't of Revenue, 148 Wash.2d 637, 645, 62 P.3d 462 (2003); Dep't of Ecology v. Campbell & Gwinn, L.L.C., 146 Wash.2d 1, 11, 43 P.3d 4 (2002); Wagg v. Estate of Dunham, 146 Wash.2d 63, 73, 42 P.3d 968 (2002). Further, we interpret the ordinance in its entirety, reviewing all provisions in relation to each other. See In re Detention of Williams, 147 Wash.2d 476, 490, 55 P.3d 597 (2002).
We do not judicially construct unambiguous ordinances. See, e.g., Fraternal Order of Eagles, Tenino Aerie No. 564 v. Grand Aerie of Fraternal Order of Eagles, 148 Wash.2d 224, 239, 59 P.3d 655 (2002), cert. denied, 123 S.Ct. 2221 (2003); State v. Glas, 147 Wash.2d 410, 415, 54 P.3d 147 (2002). We will not add language to an unambiguous ordinance even if we believe the municipality "intended something else but did not adequately express it." Kilian v. Atkinson, 147 Wash.2d 16, 20, 50 P.3d 638 (2002) (citing Wash. State Coalition for the Homeless v. Dep't of Soc. & Health Servs., 133 Wash.2d 894, 904, 949 P.2d 1291 (1997); Marquis v. City of Spokane, 130 Wash.2d 97, 107, 922 P.2d 43 (1996)). We assume the municipality meant exactly what it said when it enacted the ordinance. See In re Pers. Restraint of King, 146 Wash.2d 658, 663, 49 P.3d 854 (2002); Berger v. Sonneland, 144 Wash.2d 91, 105, 26 P.3d 257 (2001).
If the ordinance is ambiguous, we resort to tools of statutory construction, such as legislative history and relevant case law, to discern the ordinance's meaning. Kilian, 147 Wash.2d at 21, 50 P.3d 638; Dep't of Ecology, 146 Wash.2d at 12, 43 P.3d 4; Cockle v. Dep't of Labor & Indus., 142 Wash.2d 801, 808, 16 P.3d 583 (2001). "A statute is ambiguous if it can be reasonably interpreted in more than one way, but it is not ambiguous simply because different interpretations are conceivable." Kilian, 147 Wash.2d at 20, 21, 50 P.3d 638 (citing State v. Keller, 143 Wash.2d 267, 276, 19 P.3d 1030 (2001), cert. denied, 534 U.S. 1130, 122 S.Ct. 1070, 151 L.Ed.2d 972 (2002)).
Initially, we address two sub-issues. First, whether the ordinance sets a mandatory duty to issue a loan in response to garage revenue shortfalls. Second, if so, whether the ordinance precludes consideration of bond debt service in determining the size of the revenue shortfall.
Here, the ordinance plainly states, "in the event Parking Revenues are insufficient to make Ground Lease Payments and pay Operating Expenses, the City shall loan money from the Parking Meter Revenue Fund" to the PDA. CP at 132. Generally, the use of the word "shall" in a legislative enactment is presumptively mandatory, thus creating a duty. See, e.g., State v. Krall, 125 Wash.2d 146, 148, 881 P.2d 1040 (1994); Erection Co. v. Dep't of Labor & Indus., 121 Wash.2d 513, 518, 852 P.2d 288 (1993). Accordingly, the use of the word "shall" in a statute or ordinance "imposes a mandatory requirement unless a contrary legislative intent is apparent." Erection Co., 121 Wash.2d at 518, 852 P.2d 288 (citing State v. Bryan, 93 Wash.2d 177, 183, 606 P.2d 1228 (1980)). The ordinance does not indicate a contrary legislative intent.
Studying the ordinance in its entirety, it is readily apparent that the City imposed upon itself a duty to offer a loan of parking meter revenue in the event parking garage revenues are inadequate. Some revenue shortfall is conceded. Therefore, the City is obligated to offer a loan to the PDA. But, as discussed below, the ordinance is silent as to terms.
The City asks whether the writ of mandamus violates the separation of powers doctrine by encroaching on the City's legislative function. Generally, a writ of mandamus or prohibition will not lie to interfere with a municipality's legislative functions, such judicial interference being a violation of separation of powers. See, e.g., City Council of Santa Barbara v. Superior Court, 179 Cal.App.2d 389, 394-95, 3 *756 Cal.Rptr. 796, 799-800 (1960); State ex rel. Torrance v. City of Shreveport, 231 La. 840, 93 So.2d 187, 189-90 (1957); see also Walker v. Munro, 124 Wash.2d 402, 407, 879 P.2d 920 (1994) ("When directing a writ to the Legislature or its officers, a coordinate, equal branch of government, the judiciary should be especially careful not to infringe on the historical and constitutional rights of that branch.").
Section 12 of the Spokane City Charter provides that appropriations "shall be by ordinance; save where there is a special fund created for particular purpose, payments from such fund shall be made on order of the city council." The parking meter revenue fund is "a special fund and because a special fund is involved, `payments from such fund shall be made on order of the city council.'" Miggins, 143 Wash.2d at 77, 17 P.3d 1178 (quoting SPOKANE CITY CHARTER § 12). "Because section 9 of the ordinance creates a special fund, pursuant to section 12 of the Spokane City Charter, a separate order must be made to make payments from the special fund." Miggins, 143 Wash.2d at 77, 17 P.3d 1178.
An order or resolution is a ministerial act of the City Council, as distinguished from the legislative act of enacting an ordinance. See, e.g., McGlothern v. City of Seattle, 116 Wash. 331, 334-35, 199 P. 457 (1921); Ehrhardt v. City of Seattle, 33 Wash. 664, 668-69, 74 P. 827 (1903). The Miggins court used the term "legislative order," but that dictum is likely descriptive of the issuing legislative body. Miggins, 143 Wash.2d at 77, 17 P.3d 1178. Mandamus will lie to compel a ministerial act. See, e.g., Smith v. County of Missoula, 297 Mont. 368, 992 P.2d 834, 839 (1999); Hart v. City of Albuquerque, 126 N.M. 753, 975 P.2d 366, 371 (N.M.App. 1999).
Accordingly, no separation of powers problem exists. Here, the writ of mandamus merely commands the City to carry out the ministerial act of putting the loan provision into operation by resolution or order when the revenue contingency arises. The specific terms of any such loan are discretionary matters left to the City and the PDA. This outcome is consistent with the duty rules summarized above that mandamus tells the respondent what to do, but not how to do it. In any event, the City cannot peremptorily refuse a loan in the face of the PDA's showing of existing revenue deficiency.
Because a revenue shortfall is conceded, whether the bond debt service is included in the shortfall bears mainly on when the duty to make the contingent loan was triggered and the size of the shortfall and corresponding loan. This issue also turns on the meaning of the ordinance. When the trial court issued the writ, it incorporated its December 21, 2001 interpretation of the ordinance as a declaratory judgment.
The ordinance's loan provision does not mention debt service. The City argues it need not loan parking meter revenue if the PDA can meet its obligations prior to debt servicing of the bonds. The Developer insists bond debt service comes first and then if garage revenues cannot cover the PDA's obligations, the City must issue loans to cover ground rent and operating expenses.
A major flaw in the City's interpretation is its singular focus on the loan provision. As noted, we must read the provision in relation to the entire ordinance. See, e.g., Wash. Pub. Ports Ass'n v. Dep't of Revenue, 148 Wash.2d 637, 645, 62 P.3d 462 (2003). When reading the entire ordinance, its primary purpose was to facilitate the Foundation's bond issuance to enhance purchase of the garage. The eventual goal was for the City to take over garage ownership after garage revenues paid off the bonds. This plan allowed the City to limit its bond liability by relying on the Foundation.
Moreover, the ordinance states the contingent pledge of parking meter revenue was necessary as a means of assuring potential "tenants and lenders" that the City would lend a hand if the garage lost money and placed "the Project in jeopardy." CP at 128. The City recognized in the ordinance that "the Developer must receive assurances of City participation prior to pledging land and capital in order to obtain public and private financing to develop and construct the Project which will enable the Foundation to issue tax-exempt bonds and acquire the Facility." CP at 133.
*757 Viewed in context with the entire ordinance, the parking meter revenue pledge served to dispel concerns of potential bondholders that garage revenues would be insufficient to pay off the bonds. The City's current interpretation is inconsistent with this earlier purpose, which does not preclude giving priority to debt service of the bonds.
The City's interpretation also impermissibly requires us to add language to the ordinance. Caritas Servs., Inc. v. Dep't of Social & Health Servs., 123 Wash.2d 391, 409, 869 P.2d 28 (1994); Vita Food Prods., Inc. v. State, 91 Wash.2d 132, 134, 587 P.2d 535 (1978). The City insists the term "insufficient" should be read to mean "less than" the sum of ground lease and payments and operating expenses "without any consideration of debt service." City's Br. at 29.
Moreover, bond debt service was to be paid mainly through "Fixed Facility Rent" under the terms of both the facility lease between the PDA and the Foundation and the ground lease rents between those two entities and the Developer. CP at 138. Both leases give priority to bond debt service. That arrangement is consistent with the express language of the ordinance and is in harmony with the general structure of the garage financing plan endorsed by the ordinance.
The City urges us to ignore the facility and ground leases because the City is not a direct party to those agreements. But, the ordinance expressly stated those leases were to be executed between the PDA, the Foundation, and the Developer, with the City assuming the ground lease after it takes ownership of the garage. And, the ordinance did not expressly prohibit those agreements giving priority to debt service on the bonds. Accordingly, the City's contention that the loan provision of the ordinance precludes any consideration of debt service fails.
Even if the loan provision was ambiguous, the legislative history supports the Developer's interpretation.[6] In 1995, the City contemplated a direct issue of bonds payable "exclusively from parking garage revenues." CP at 2764. As discussed at the October 17, 1996 City Council meeting, this original plan contemplated that the garage parking revenues would flow first to operating expenses, then to bond debt servicing, and then to the ground lease.[7]
To limit its liability on the bonds, the City abandoned that original plan in favor of relying on the Foundation to issue the bonds and purchase the garage with the proceeds. The November 1996 City Council presentation leading to the current garage financing structure optimistically anticipated garage revenue would "be more than sufficient to repay all expenses incident to the garage, debt service, lease payments and operating expenses." CP at 1834.
Before enacting the ordinance at the January 27, 1997 meeting, the City Council considered both oral and written presentations of Coopers & Lybrand that indicated garage revenues would first go to debt service on the bonds. The Coopers & Lybrand report further noted "that the parking meter revenues pledged by the City are intended to *758 cover ground lease payments and operating and maintenance expenses of the garage only, and will not be used to fund debt service obligations under the bonds." CP at 1274. The transcript of the City Council meeting indicates the Council understood that such loans were intended to pay maintenance, operating expenses, and lease obligations, but not to pay off the bonds. But that understanding did not contradict the flow of garage parking revenues going first to debt service.
The City argues the Coopers & Lybrand representatives qualified their report by stating that they had not reviewed the draft ordinance in preparing their report. Nevertheless, the Coopers & Lybrand report and presentation informed the City Council that garage revenue was expected to flow first to satisfaction of the bonds. That proposed flow was consistent with the purpose of the bond financing plan; garage revenues were to pay off the bonds so the City could eventually obtain the garage.[8]
Consistent with that historical background, the ordinance expressly states the Foundation would pay off the bonds with garage revenue alone. And, the ordinance states that the City would acquire full legal and unencumbered title to the Facility after the Foundation paid off the bonds.
We emphasize the parking meter loan pledge is not a bond guarantee. By the terms of the ordinance, parking meter revenue loan proceeds are limited to payment of lease, maintenance, and operating expenses. But the secondary effect of such a loan would be to make available garage parking revenue for debt servicing that would otherwise go to pay ground rent and operating expenses.
When the loan provision is read in relation to the entire ordinance, the Developer's interpretation is correct. That interpretation is in harmony with the ordinance's overall objectives. By contrast, the City's interpretation is strained, and conflicts with the legislative purpose. The ordinance language "should be construed to carry out, rather than defeat," the ordinance's purpose. State v. Votava, 149 Wash.2d 178, 184, 66 P.3d 1050 (2003) (citing Miller v. Paul Revere Life Ins. Co., 81 Wash.2d 302, 310, 501 P.2d 1063 (1972) (construing statute)). Accordingly, the trial court did not err in concluding a parking meter revenue loan must issue when garage revenue is insufficient to pay ground rent and operating expenses after debt service on the bonds[9]. The Supreme Court recognized the triggering condition, garage revenue shortfall, has existed in some degree for some time. River Park Square, L.L.C. v. Miggins, 143 Wash.2d 68, 72, 17 P.3d 1178 (2001). A City declaration on the issue indicates a loan would have to be made, albeit in a much smaller amount, even if this court were to adopt the City's interpretation of the ordinance. As Mr. Eugster commented at the April 26, 2000 City Council meeting, "[a]t the present time, revenue generated by the Parking Garage is not even sufficient to pay the fixed facility rent, much less operating expenses, much less ground lease payments." CP at 3462.
In sum, this dispute is more about the amount of the loan, than whether a loan was contemplated in the first place. Relying on overly optimistic garage revenue projections, the City supported the garage financing plan with the expectation that the garage would consistently operate in the black even after payment of the bonds. Now, when faced with the prospect of loaning millions of dollars *759 of parking meter revenue, the City pursues damage control. Nevertheless, the trial court correctly interpreted the ordinance; the City has a duty to offer a loan to the PDA because garage revenues are insufficient to pay the ground lease and operating costs after debt servicing of the bonds.
2. Remedy Element. Now, having decided the City has a duty, we turn to the remedy element. "The writ must be issued in all cases where there is not a plain, speedy and adequate remedy in the ordinary course of law." RCW 7.16.170. "A statutory writ is an extraordinary remedy, and should issue only when there is no plain, speedy and adequate remedy in the ordinary course of law." City of Kirkland v. Ellis, 82 Wash. App. 819, 827, 920 P.2d 206 (1996) (footnotes and citations omitted).
A remedy is not inadequate merely because it is attended with delay, expense, annoyance, or even some hardship. There must be something in the nature of the action that makes it apparent that the rights of the litigants will not be protected or full redress will not be afforded without the writ.
Id. (citing State ex rel. O'Brien v. Police Court, 14 Wash.2d 340, 347-48, 128 P.2d 332 (1942)).
Broadly, the remedy issue turns on whether the duty the plaintiff seeks to enforce "cannot be directly enforced" by any means other than mandamus. Bd. of Liquidation v. McComb, 92 U.S. 531, 536, 23 L.Ed. 531, 2 Otto 531 (1875). "The general principle which governs proceedings by mandamus is, that whatever can be done without the employment of that extraordinary remedy, may not be done with it. It only lies when there is practically no other remedy." Ex parte Rowland, 104 U.S. 604, 617, 26 L.Ed. 861, 14 Otto 604 (1881).
Initially, we consider Mr. Eugster's contention that the Developer's affidavit was inadequate. The mandamus statute partly states the writ "must be issued upon affidavit on the application of the party beneficially interested." RCW 7.16.170. Alternatively, the mandamus applicant can rely on a verified complaint. State ex rel. Adams v. Irwin, 74 Wash. 589, 591-92, 134 P. 484 (1913). The affidavit or complaint must "allege sufficient facts to establish that the appellants had no plain, speedy, or adequate remedy in the ordinary course of law." Edwards v. Tremper, 49 Wash.2d 677, 678, 305 P.2d 1062 (1957). Here, the Developer's affidavit and pleadings support the mandamus application.
Contrary to Mr. Eugster's argument, no authority requires the mandamus affidavit to recite, "there is not a plain, speedy and adequate remedy in the ordinary course of law." RCW 7.16.170. Mr. Eugster's hypertechnical argument fails. The two cases he relies upon for claiming the trial court lacked mandamus jurisdiction are inapposite; this is not a case where the applicant failed to file the required affidavit at all. See Crosby v. County of Spokane, 137 Wash.2d 296, 301-02, 971 P.2d 32 (1999); Birch Bay Trailer Sales, Inc. v. Whatcom County, 65 Wash.App. 739, 744-45, 829 P.2d 1109 (1992). The relevant inquiry is whether the Developer's affidavit and other filings alleged sufficient facts for the trial court to determine whether there was no "plain, speedy and adequate" remedy. RCW 7.16.170; Edwards, 49 Wash.2d at 678, 305 P.2d 1062; Adams, 74 Wash. at 591, 134 P. 484. The trial court, exercising its discretion, decided the Developer was without such a remedy.
Now, our focus returns to whether the trial court abused its discretion in deciding for the Developer regarding lack of remedies.[10] In Miggins, the Developer sought solely a writ of mandamus. Here, the Developer pleaded mandamus as an alternative to a significant number of simultaneously pleaded contract-based remedies. The Developer's two-prong strategy naturally complicates our analysis.
*760 Regarding potential contract-based remedies, the trial court reasoned the Developer was without a plain, speedy, and adequate remedy because none of its contract-based theories would compel the City to make the requested loan. Inconsistently with his other arguments, Mr. Eugster contends no contract exists. Here, the Developer contended in its briefing mandamus is appropriate notwithstanding its contract claims. However, the Developer clouded its position at oral argument when it argued a contract may or may not exist. At least we know a contract remedy was originally alleged.
Whether the ordinance constitutes a contract is crucial because our research has thus far failed to locate a case in any jurisdiction where a plaintiff simultaneously pleaded contract and mandamus theories. Moreover, numerous jurisdictions hold that a plaintiff may not enforce a contract or other agreement through mandamus where specific performance is an available alternative remedy. Coach and Six Restaurant, Inc. v. Pub. Works Comm'n, 363 Mass. 643, 296 N.E.2d 501, 503 (1973); Bd. of County Road Comm'rs of County of Oakland v. Mich. State Highway Comm'n, 79 Mich.App. 505, 261 N.W.2d 329, 332 (1977); State ex rel. Butte Youth Serv. Ctr. v. Murray, 170 Mont. 171, 174, 551 P.2d 1017 (1976); State ex rel. Wright v. Weyandt, 50 Ohio St.2d 194, 363 N.E.2d 1387, 1389-91 (1977). "Traditional contract law suggests that where damages are not adequate, specific performance may be sought, both of which remedies are within the ordinary course of the law." State ex rel. Curd v. Backhaus, 56 Ohio App.2d 79, 381 N.E.2d 646, 648 (1977) (citing State ex rel. Bross v. Carpenter, 51 Ohio St. 83, 37 N.E. 261 (1894)). However, our Supreme Court reasoned more than 70 years ago that specific performance ordinarily cannot lie to compel a promise to loan money. Steward v. Bounds, 167 Wash. 554, 565, 9 P.2d 1112 (1932). Here, the Developer asserted specific performance of the alleged contract.
Similarly, several jurisdictions hold mandamus will not lie where the plaintiff is afforded adequate equitable remedies, such as injunctive relief. George S. Chatfield Co. v. Reeves, 87 Conn. 63, 86 A. 750, 751 (1913); Application of Air Terminal Servs., Inc., 47 Haw. 499, 393 P.2d 60, 78 (1964); City of Coral Gables v. State ex rel. Worley, 44 So.2d 298, 300-01 (Fla.1950); Craig v. Int'l Tri-D Corp., 338 So.2d 952, 954 (La.App.1976); Parrotta v. Hederson, 315 Mass. 416, 53 N.E.2d 97, 99 (1944); Garraway v. State ex rel. Dale, 184 Miss. 466, 185 So. 803, 805-06 (1939); Davidson v. Almeda Consol. Mines Co., 66 Or. 412, 134 P. 782, 783-84 (1913). Here too, the Developer relies on equitable theories sounding in contract, such as detrimental reliance. USB also relies on equitable theories, thus undermining its own argument for mandamus.
Nevertheless, a claim for damages may not be an adequate remedy in some situations where a court or other public official is under a clear duty to act. See, e.g., Am. Bridge Co. v. Wheeler, 35 Wash. 40, 45-46, 76 P. 534 (1904). Still, the Developer's authorities do not involve plaintiffs simultaneously pleading contract damages, specific performance, and the "alternative" theory of mandamus. CP at 123. The Developer's simultaneous pursuit of multiple theories of recovery along with the "alternative" of mandamus is unique. The difficulties inherent in this approach were readily apparent at oral argument as the Developer struggled with this issue. In any event, we must now resolve whether the ordinance is a contract.
The party asserting the existence of an express or implied contract bears the burden of proving the essential elements of a contract, including mutual intent. Bogle & Gates, P.L.L.C. v. Holly Mountain Res., 108 Wash.App. 557, 560, 32 P.3d 1002 (2001). The essential elements of a contract are subject matter, parties, promise, terms and conditions, and, depending on jurisdiction, price or consideration. Id. at 561, 32 P.3d 1002. Here, the Developer by pursuing its dual strategy has the heavy burden of showing the asserted contract-based claims do not also afford a plain, speedy, and adequate remedy.
"Generally, a statute is treated as a contract when the language and circumstances demonstrate a legislative intent to create rights of a contractual nature enforceable against the State." Wash. Fed'n of *761 State Employees, AFL-CIO, Council 28, AFSCME v. State, 101 Wash.2d 536, 539, 682 P.2d 869 (1984) (citing United States Trust Co. v. New Jersey, 431 U.S. 1, 17 n. 14, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977)). "Statutorily created contract rights, however are rare." Wash. Fed'n of State Employees v. State, 127 Wash.2d 544, 561, 901 P.2d 1028 (1995). "If a statute is subject to full legislative control by future amendments and repeals, the statute declares policy to be pursued until the Legislature ordains otherwise, in contrast to creating contractual or vested rights." Noah v. State, 112 Wash.2d 841, 843-44, 774 P.2d 516 (1989) (citing Wash. Fed'n of State Employees, 101 Wash.2d at 539-40, 682 P.2d 869).
Here, the ordinance may be susceptible to amendment, but given that the ordinance forms the basis for a number of agreements, including a Housing and Urban Development (HUD) loan, we doubt it can be repealed outright without raising significant constitutional issues. See, e.g., Cuyahoga Metro. Housing Auth. v. City of Cleveland, 342 F.Supp. 250, 259 (N.D.Ohio 1972) (granting injunction against city ordinance canceling HUD low income housing cooperation agreement as impairment of a contract under article I, section 10 of the United States Constitution).
In any event, even if a statute creates a right contractual in nature, it does not necessarily follow the statute "in and of itself constitutes a complete contract." Noah, 112 Wash.2d at 844, 774 P.2d 516. The contract analogy recognizes rights contractual in nature but also affords the legislative body flexibility to amend or improve the statute or ordinance as conditions change. Id. at 844-45, 774 P.2d 516.
Here, the ordinance shows the Council's intent that the City participate in the River Park Square project by taking title to the garage after the bonds had been paid off. The ordinance authorizes the execution of various agreements between the PDA, the Foundation, and the Developer, with the City assuming the ground lease when it takes possession of the garage. At the center of this controversy, the City "pledges" to loan parking meter revenue to the PDA "in the event Parking Meter Revenues are insufficient to make Ground Lease Payments and pay Operating Expenses." CP at 132.
The ordinance resembles a contract with respect to the loan pledge, but leaves too much unsaid to be a complete contract. The ordinance is silent on the role of bond debt servicing in determining whether garage parking revenue is insufficient to pay the ground lease and operating expenses. The ordinance is silent also as to the terms of the anticipated facility and ground leases. Moreover, the ordinance is silent as to the terms of any parking meter revenue loan.
Further, while the ordinance anticipates the execution of the ground and facility leases, it did not and could not incorporate those then yet to be executed agreements; they came into being 18 months later. As discussed, the lease terms are critical because they control the flow of garage revenue.
The ordinance is properly viewed as the City Council's policy commitment, similar to a letter of intent, to support the garage project and to direct its executive branch, the Mayor and city staff, to execute a loan agreement with the PDA when the proper circumstances arise. Accordingly, while the ordinance places a contingent duty on the City to enter a loan agreement with the PDA, it is not a complete contract readily enforceable by traditional contract remedies.
Given all, we decline to delve now into the intricacies of Berg v. Hudesman, 115 Wash.2d 657, 801 P.2d 222 (1990), the parole evidence rule, and other similar contract concepts to determine whether the ordinance is also an enforceable contract. See generally Bogle & Gates, 108 Wash.App. 557 at 560, 32 P.3d 1002 (noting role of parole evidence in determining whether contract is wholly written or partly oral). Moreover, the alternative contract remedy is not easily considered "plain" and it is unlikely very "speedy." RCW 7.16.170.
In sum, the trial court had a tenable basis for concluding that none of the Developer's asserted contract-based theories would provide the kind of remedy necessary to defeat the alternative mandamus relief. Accordingly, the trial court did not abuse its discretion *762 in determining the Developer was without a plain, speedy, and adequate remedy in the ordinary course of law.
3. Alleged Material Fact Issues. Even if the City has a duty under the ordinance to issue a loan, and the Developer is without a plain, speedy, and adequate remedy, legal and equitable concerns may yet preclude mandamus. As noted, mandamus "ought not to be issued in cases of doubtful right." Life & Fire Ins. Co. v. Heirs of Wilson, 33 U.S. (8 Pet.) 291, 302-03, 8 L.Ed. 949 (1834). Stated another way, the plaintiff's claim against the government entity must be clear and not the result of the plaintiff's fault. See Am. Bridge Co. v. Wheeler, 35 Wash. 40, 45, 76 P. 534 (1904) (noting the plaintiff "has been in no way at fault" for the county's obligation). In this connection, the City, Mr. Eugster, and Ms. Rodgers have consistently argued that trial is necessary to resolve material fact issues affecting the appropriateness of mandamus. The trial court disagreed, reasoning the relevant issues were entirely legal.
Impacting this part of our analysis is the ongoing federal litigation arising from the same facts. Essentially, the federal litigation involves the same factually intensive equitable issues that Mr. Eugster and Ms. Rodgers assert should have prevented issuance of the mandamus. Because the federal court has progressed this far relying on the trial court's decision to grant mandamus as part of its legal landscape, and the reality that the factual disputes are before the federal court, it serves little or no purpose to delve into them here or consider remand for duplicative fact finding by the trial court. Further, as discussed below, some of these issues have already been raised and resolved in other litigation. In any event, a brief discussion is warranted.
The party served or subject to a mandamus writ "may show cause by answer, under oath, made in the same manner as an answer to a complaint in a civil action." RCW 7.16.200. After considering the application and answer, the trial court has discretion to determine whether factual questions remain "essential to the determination of the motion, and affecting the substantial rights of the parties" bearing on the "truth of the allegation of which the application for the writ is based." RCW 7.16.210; see also Trans-Canada Enters., Ltd. v. King County, 29 Wash.App. 267, 275, 628 P.2d 493 (1981) (noting bench trial held pursuant to RCW 7.16.210 to resolve factual disputes in mandamus action). Here, the trial court exercised its discretion to forego additional fact finding before deciding to issue the mandamus.
Although some non-critical factual inquires may remain, the trial court did not abuse its discretion. First, the City, Mr. Eugster, and Ms. Rodgers argue the requested loan would be an illegal gift or loan to a private entity under article VIII, section 7, of the Washington Constitution. However, the Supreme Court reviewed the constitutionality of the ordinance's contingent loan provision and held it not to constitute either a prohibited gift or loan. CLEAN v. City of Spokane, 133 Wash.2d 455, 469-70, 947 P.2d 1169 (1997).
Second, referring to the Developer's over-evaluations of the garage, Ms. Rodgers asserts genuine fact issues remain as to whether the Developer has unclean hands. Mandamus "will not be granted in aid of those who do not come into court with clean hands." United States ex rel. Turner v. Fisher, 222 U.S. 204, 208, 32 S.Ct. 37, 56 L.Ed. 165 (1911). While mandamus is a legal remedy, it operates under equitable principles. J.W. Whitehouse v. Illinois Cent. R.R. Co., 349 U.S. 366, 373, 75 S.Ct. 845, 99 L.Ed. 1155 (1955); see also Johnston v. Schlarb, 7 Wash.2d 528, 541-42, 110 P.2d 190 (1941). This factual dispute is likely to be resolved in the federal litigation, at least as to the bondholders. As the CLEAN court noted, "[a]lthough Appellants may view the transaction as an unwise use of public funds that unduly benefits the Developers, the wisdom of the plan is not for this court to consider." CLEAN, 133 Wash.2d at 470, 947 P.2d 1169.
Third, Mr. Eugster argues applying the terms of the facilities lease results in an illegal use of any loan. Mandamus cannot compel an act outside the governmental entity's lawful authority. State ex rel. Taro v. City of Everett, 101 Wash. 561, 565-66, 172 P. 752 (1918). Mr. Eugster's argument *763 merely speculates regarding preliminary facts. An unsigned facility lease between the PDA and the Foundation appears to dump parking revenue loan proceeds into a common "Revenue Account," along with garage parking revenue and other loan proceeds. Payments from the "Revenue Account" are prioritized and require parking revenue to flow first to debt service on the bonds. But, the ordinance prohibits pledging City assets "to the payment of principal or interest on the Foundation's Bonds." CP at 132. Nevertheless, the mere potential for a violation exists. As such, the trial court did not abuse its discretion to proceed without fact finding.
Fourth, considering the federal litigation, the writ may well be futile. Mandamus is inappropriate to command "the performance of useless or vain acts." Vashon Island Comm. for Self-Government v. Wash. State Boundary Review Bd., 127 Wash.2d 759, 765, 903 P.2d 953 (1995) (citing Neilson v. Vashon Island Sch. Dist. 402, 87 Wash.2d 955, 960, 558 P.2d 167 (1976)). A court "will not compel by mandamus the doing of an act that would serve no useful purpose, nor should a writ issue when by operation of law a compliance with the mandate could have no operative effect." State ex rel. City of Tacoma v. Rogers, 32 Wash.2d 729, 733, 203 P.2d 325 (1949). Still, it would be an unwise use of scarce judicial resources and serve no useful purpose to remand for fact finding duplicating the federal litigation. Further, the CLEAN court aptly observed that although the plan may have "unduly benefited the Developers, the wisdom of the plan is not for this court to consider." CLEAN, 133 Wash.2d at 470, 947 P.2d 1169. Considering all, we conclude the trial court did not abuse its discretion.

B. Open Public Meetings Act (OPMA)
The issue is whether the trial court erred in dismissing Mr. Eugster's and Ms. Rodgers' OPMA claims in summary judgment. Mr. Eugster and Ms. Rodgers generally claim the City violated OPMA in connection with meetings held with representatives of Standard's & Poors and Coopers & Lybrand in December 1996 and January 1997, and such violations nullify the ordinance.
"Here the parties submitted cross motions for summary judgment, essentially conceding that there were no issues of material fact." Shelton v. Strickland, 106 Wash.App. 45, 50, 21 P.3d 1179, review denied, 145 Wash.2d 1003, 35 P.3d 380 (2001). Accordingly, this court conducts a de novo review of the trial court's legal conclusions. Id.
"All meetings of the governing body of a public agency shall be open and public and all persons shall be permitted to attend any meeting of the governing body of a public agency, except as otherwise noted in this chapter." RCW 42.30.030. "Any action taken at meetings failing to comply [with the OPMA] shall be null and void." RCW 42.30.060(1). "`Action' means the transaction of the official business of a public agency by a governing body including but not limited to receipt of public testimony, deliberations, discussions, considerations, reviews, evaluations, and final actions." RCW 42.30.020(3).
Even assuming an OPMA violation, Mr. Eugster's attempt to invalidate the ordinance on this ground fails because the enactment of the ordinance itself did not violate the statute. As a general rule, meetings held in violation of OPMA will not invalidate a later final action taken in compliance with the statute. See Org. to Preserve Agric. Lands (OPAL) v. Adams County, 128 Wash.2d 869, 883, 913 P.2d 793 (1996); Clark v. City of Lakewood, 259 F.3d 996, 1014-15 (9th Cir.2001); 33 Att'y Gen. Op. 40 (1971). Here, unquestionably the City Council adopted the ordinance in a public meeting after listening to a great deal of public comment, both for and against the project, much of the opposing comments coming from Mr. Eugster. Accordingly, even if the challenged meetings violated OPMA, such violations will not nullify the properly enacted ordinance. OPAL, 128 Wash.2d at 883, 913 P.2d 793; Clark, 259 F.3d at 1014-15.
Moreover, to escape summary dismissal of an OPMA claim, the plaintiff must produce evidence showing (1) members of a governing body (2) held a meeting of that body (3) where that body took action in violation of OPMA, and (4) the members of that body had knowledge that the meeting *764 violated the statute. Eugster v. City of Spokane, 110 Wash.App. 212, 222, 39 P.3d 380, review denied, 147 Wash.2d 1021, 60 P.3d 92 (2002); Wood v. Battle Ground Sch. Dist., 107 Wash.App. 550, 558, 27 P.3d 1208 (2001). "A `meeting' takes place when a majority of the governing body meets and takes `action.'" Eugster, 110 Wash.App. at 222-23, 39 P.3d 380 (quoting RCW 42.30.020(4)); Wood, 107 Wash.App. at 564, 27 P.3d 1208. Mr. Eugster's declarations and exhibits do not raise a reasonable inference that a majority of the City Council held meetings and took action in knowing violation of OPMA at the alleged meetings.

C. Washington Ethics in Government Act
The issue is whether the trial court erred in dismissing Mr. Eugster's claim that the River Park Square project is null and void because City Council member Orville Barnes benefitted in violation of the Washington Ethics in Government Act.
In general, a municipal officer shall not benefit, directly or indirectly, through any contract with the municipality. RCW 42.23.030. And a municipal officer may not vote to authorize, approve, or ratify a contract if the officer has a beneficial interest in the contract. Id. The municipal officer must disclose his or her beneficial interest on the record before formation of the contract. Id.
Without citation to the record, Mr. Eugster makes vague allegations regarding Mr. Barnes' alleged employer having a possible interest in land or a leasehold not part of the mall, but somehow benefiting by a skywalk connected to the mall. Ms. Rodgers' citations to the record are inapt. Proper citation is imperative considering the massive record. We will not consider an issue unsupported by citation to the record and reasoned argument. RAP 10.3(a)(5); Cowiche Canyon Conservancy v. Bosley, 118 Wash.2d 801, 809, 828 P.2d 549 (1992).
In passing, while Mr. Barnes' alleged employer may derive some economic benefit from the skywalk connection to River Park Square mall by improved customer access, and may have made some arrangement with River Park Square for skywalk maintenance, no evidence in the record suggests Mr. Barnes' alleged employer was a party to any relevant City contract or has any specific beneficial interest here.

D. Attorney Fees
Mr. Eugster alone demands attorney fees under RCW 42.30.120 for his OPMA claim and generally. Normally, we will not grant a request for attorney fees absent an authorizing statute, contract, or recognized ground in equity. All Around Underground v. Wash. State. Patrol, 148 Wash.2d 145, 160, 60 P.3d 53 (2002). However, Mr. Eugster's OPMA claims have been rejected. The mandamus statute contains no attorney fee or cost provisions. Finally, we reject Mr. Eugster's invitation to fashion a common-law attorney fee remedy.
Affirmed.
WE CONCUR: SWEENEY and KURTZ, JJ.
NOTES
[1] We note that small excerpts of three critical City Council meetings are scattered throughout the more than 3,600 pages of clerk's papers. These excerpts are confusingly labeled. Accordingly, we have relied mainly on the context of each excerpt to determine the corresponding meeting date.
[2] The Developer tried to amend the Miggins writ application after the Supreme Court's ruling, but the superior court dismissed the action without prejudice. This court affirmed the dismissal order in an unpublished opinion. River Park Square, L.L.C. v. Sloane, No. 20339-5-III, 2003 WL 1521953 (filed March 25, 2003).
[3] According to the City's brief, it also filed a complaint in connection with the River Park Square controversy in July 2000. That complaint, City of Spokane v. Walker, Spokane County Superior Court Cause No. 00-2-04173-4, was stayed pending the Miggins appeal. The City asserts it voluntarily dismissed its state claims and defenses and moved them to a federal court action described below.
[4] Both the Developer and the City have filed requests for judicial notice focusing primarily on the federal matter. We take judicial notice of the bondholders' complaint and the federal court's rulings inasmuch as they implicate this appeal. But we decline to take judicial notice of briefs and memorandums submitted to that court; we rely solely on the briefs on appeal.
[5] We reject Mr. Eugster's contention the Developer's motion for partial summary judgment regarding mandamus was not properly before the trial court under CR 56(a). The record shows Mr. Eugster initiated this action in July 2000. In response, the Developer filed its current mandamus claim in June 2001. Mr. Eugster filed his own motion for partial summary judgment in October 2001. In January 2002, the trial court dismissed some of the Developer's claims against Mr. Eugster without prejudice, but not the contract and mandamus claims. In February 2002, the Developer filed a second amended answer repeating its earlier contract and mandamus claims. Concurrently, the Developer filed a new and separate application for mandamus along with a cross-motion for partial summary judgment. Given the procedural record of this case, the trial court did not err in rejecting Mr. Eugster's argument.
[6] The City asks us not to consider a draft ground lease the Developer claims it submitted to the City prior to enactment of the ordinance that supports the Developer's contention that garage parking revenue was intended to flow first to debt service on the bonds. A filing stamp indicates the draft ground lease was filed with the City on January 13, 1997. Further, in CLEAN v. City of Spokane, 133 Wash.2d 455, 947 P.2d 1169 (1997), the City and the Developer stipulated that the draft ground lease was part of the legislative record considered by the City Council.

The City also objects to the post hoc affidavits of several city attorneys and staff involved directly in the development of the current garage financing plan. We agree with the City that the post hoc affidavits of various city staff and attorneys are not admissible evidence of legislative intent. See, e.g., City of Yakima v. Int'l Ass'n of Firefighters, 117 Wash.2d 655, 677, 818 P.2d 1076 (1991) (noting affidavits of legislators are not admissible evidence of legislative intent). In any event, the exhibits challenged in this footnote are unnecessary in determining the legislative intent underlying the ordinance.
[7] We deny the City's RAP 9.11 additional evidence motion with respect to another portion of the October 17, 1996 City Council meeting transcript. In that excerpt, Betsy Cowles relates garage revenues would flow first to operating expenses, then to bond debt service, and then to the ground lease. Ms. Cowles' statement is cumulative, merely conforming to a statement already in the record. RAP 9.11(a)(1).
[8] We deny the City's RAP 9.11 motion for additional evidence asking us to consider the affidavit and deposition testimony of a Coopers & Lybrand employee in determining the meaning of the ordinance. The proffered evidence is irrelevant to the intent of the City Council and cumulative; it merely confirms Coopers & Lybrand's representation that it did not study the proposed ordinance and its parking meter revenue pledge. RAP 9.11(a)(1).
[9] More than a month after oral argument, the Developer filed a RAP 9.11 additional evidence motion regarding a statement made at the November 25, 1996 City Council meeting. The statement seemingly supports the Developer's argument that bond debt service has priority under the current garage financing plan. We deny the motion because the proffered evidence does not change the result. RAP 9.11(a)(2). We further deny the City's claim for attorney fees incurred in responding to the motion. The Developer's motion was not frivolous, and it would be inequitable to grant attorney fees in light of the City's failed RAP 9.11 motion.
[10] In passing, we note that the trial court stated incorrectly in its memorandum opinion that the City had failed to show the Developer lacked an adequate remedy. The burden of showing the lack of remedy rests upon the Developer. Mallard v. Dist. Court of S. Dist. of Iowa, 490 U.S. 296, 309, 109 S.Ct. 1814, 104 L.Ed.2d 318 (1989). In any event, we review the trial court's decision under the abuse of discretion standard. River Park Square, L.L.C. v. Miggins, 143 Wash.2d 68, 76, 17 P.3d 1178 (2001).